**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| **VEC, INC.,** | : | |
| **Plaintiff,** | : | **CIVIL ACTION NO. 3:19-cv-2148** |
| **v.** | : | **(JUDGE MANNION)** |
| **JOYCE ELECTRICAL, INC., and HUDSON INSURANCE CO.,** | : | |
| **Defendants.** | : | |
|  | : | |

## MEMORANDUM

Before the court is Defendants' motion for partial summary judgment, (Doc. 59). They have filed their brief in support, (Doc. 61), statement of material facts, (Doc. 60), and reply brief. (Doc. 70). Plaintiff has filed its brief in opposition, (Doc. 68), and a response to Defendants' statement of material facts. (Doc. 69).

Plaintiff VEC, Inc. ("VEC") hired Defendant Joyce Electrical, Inc. ("Joyce") to perform work on an electric substation project for which VEC was the primary contractor. VEC later declared Joyce in default, Joyce left the project, and VEC brought on other subcontractors to finish the work, which was completed late. VEC now seeks to recover damages from Joyce and its insurer, Defendant Hudson Insurance Co. ("Hudson"). Defendants

assert counterclaims, and have moved for summary judgment on two of the claims against them and one of their claims against VEC.

## I.     BACKGROUND

In March 2019, Williams Field Service Company, LLC ("Williams") awarded VEC the contract for the construction of an electric substation in Susquehanna County (the "Project"). (Doc. 1 ¶¶7, 17; Doc. 60 ¶10.) VEC subcontracted with Joyce for electrical work and with The Hillis Group, LLC ("Hillis") for civil work. (Doc. 1 ¶¶20, 22; Doc. 2-1; Doc. 69 ¶5).

The Project's start date was April 1, 2019, and its required mechanical completion date was July 30, 2019. (Doc. 60 ¶¶20, 22; Doc. 69 ¶20, 22). Under its contract with Williams, VEC was subject to liquidated damages for late completion of $20,000 per day, up to a maximum of $280,000. (Doc. 60 ¶53; Doc. 69 ¶53; Doc. 69-29 §7.4). The Letter of Engagement between VEC and Joyce provided that VEC would "share all liquidated damages and any bonuses equally" with the two subcontractors, such that liquidated damages would be divided in thirds. (Doc. 2-1). The parties executed a subcontract order on March 28, 2019. (Doc. 69-4). Joyce obtained payment and performance bonds from Hudson. (Doc. 1 ¶27; Doc. 15 ¶27; Doc. 69-47).

After work on the Project had started, VEC asked Joyce to sign its Master Subcontract Agreement. (Doc. 60 ¶31; Doc. 69 ¶31; Doc. 69-6). The parties dispute whether Joyce had previously received a copy of the MSA. (Doc. 60 ¶31; Doc. 69 ¶31). Joyce signed the MSA. (Doc. 60 ¶34; Doc. 69 ¶34).

On Monday, June 24, 2019, VEC defaulted Joyce on the subcontract. (Doc. 69-39; Doc. 60 ¶49; Doc. 69 ¶49). Joyce did not return to the project after Friday, June 21, 2019. (Doc. 60 ¶50; Doc. 69 ¶50). VEC then hired other subcontractors to complete Joyce's scope of work, (Doc. 1 ¶¶44–46), and achieved substantial completion on August 30, 2019. (Doc. 60 ¶52; Doc. 69 ¶52). VEC alleges that because of Joyce's default it incurred damages exceeding $1,300,000. (Doc. 1 ¶48).

VEC brings claims of (I) breach of contract, (II) unjust enrichment, and (III) conversion against Joyce. (Doc. 1). It also claims that Hudson failed to honor its obligations to VEC under the performance bond by which it was Joyce's surety. (Id.). Defendants assert counterclaims of (I) breach of contract, (II) violation of the Pennsylvania Contractor and Subcontractor Payment Act, (III) conversion, (IV) fraud in the inducement, and (V) equitable estoppel. (Doc. 15 at 28–36).

## II.   STANDARD OF REVIEW

Summary judgment must be granted if the movant shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). The movant meets his burden by pointing to an absence of evidence supporting an essential element as to which the non-moving party will bear the burden of proof at trial. *Id.* at 325. Once the moving party meets its burden, the burden then shifts to the non-moving party to show that there is a genuine issue for trial. Fed.R.Civ.P.56(e)(2). An issue is "genuine" only if there is a sufficient evidentiary basis for a reasonable jury to find for the non-moving party, and a factual dispute is "material" only if it might affect the outcome of the action under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). The facts and all reasonable inferences drawn therefrom must be viewed in the light most favorable to the nonmoving party. *P.N. v. Clementon Bd. Of Educ.*, 442 F.3d 848, 852 (3d Cir. 2006).

In opposing summary judgment, the non-moving party "may not rely merely on allegations of denials in its own pleadings; rather, its response must... set out specific facts showing a genuine issue for trial." Fed. R. Civ.

P. 56(e)(2). The nonmoving party "cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial." *Jones v. United Parcel Serv.*, 214 F.3d 402, 407 (3d Cir. 2000). Arguments made in briefs "are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion." *Jersey Cent. Power & Light Co. v. Twp. Of Lacey*, 722 F.2d 1103. 1110 (3d Cir.1985).

The court has jurisdiction over this matter under 28 U.S.C. §1332(a). "A federal court sitting in diversity must apply state substantive law and federal procedural law." *Chamberlain v. Giampapa*, 210 F.3d 154, 158 (3d Cir. 2000). The parties do not dispute that Pennsylvania substantive law applies here. (See Doc. 61 at 7; Doc. 68 at 11).

### III.   DISCUSSION

Defendants move for partial summary judgment on Counts I and IV of the Complaint, and Count V of their counterclaims. (Doc. 59).

## A. Enforceability of the Master Subcontractor Agreement

Joyce asserts that it is entitled to partial summary judgment on Count I of the Complaint and Count V of its counterclaim because the MSA is void and unenforceable. (Doc. 61 at 7, 15).

### 1. Count I of the Complaint

Underlying the opposing arguments on this score is a disagreement about when Joyce first received the MSA. According to Joyce, that did not occur until "approximately nine weeks after work commenced," and thus "after Joyce was already contractually obligated to perform its scope of work pursuant to the Subcontract Order and Letter of Engagement." (Doc. 61 at 11–12). The MSA, Joyce argues, which purportedly attempted "to foist upon Joyce much more onerous terms than were included" in the earlier documents, afforded Joyce no new consideration in exchange for agreeing to such terms. (Doc. 61 at 11–13). VEC, however, states that it provided Joyce with the MSA during a February 2019 pre-bid meeting and again when it issued the subcontract order. (Doc. 68 at 7–8). It argues that the MSA is enforceable because the subcontract order expressly incorporates it, because it is ancillary to the earlier executed agreements, and because Joyce accepted the MSA by commencing performance on the Project.

- 6 -

Defendants assert that "[i]t is undisputed that VEC did not present the MSA to Joyce for Joyce's signature until June 6, 2019. (Doc. 61 at 7). VEC's subcontract manager, David Basalyga, testified that he first gave Joyce the MSA for review at a "construction kickoff meeting" in February 2019. (Doc. 69-8 at 24:1–13).[1] VEC also offers a May 23, 2019 email in which Basalyga asked John Joyce (the principal of Joyce) to send the signed MSA "that I sent you when the PO was issued," (Doc. 69-6), as well as a follow-up to this email sent on June 3rd. (Doc. 69-27). On June 6th, Mr. Joyce responded: "Dave, Can you send that again. I did get it but I can't find it." (Doc. 69-28). He returned the signed agreement the same day. (Id.). Contrary to Defendants' assertion, then, it is not "undisputed that VEC did not present the MSA to Joyce for Joyce's signature until June 6, 2019. (Doc. 61 at 7).[2] Additionally, the subcontract order dated March 28, 2019 contains the following language: "Subcontractors must meet the requirements that are on

---

[1] Basalyga testified the following:
    Q: When is the first time you ever sent an MSA to Joyce for signature?
    A: I brought it in person at the construction kickoff meeting in Tunkhannock, Pennsylvania.
(Doc. 59-2 at 24:1–4).
[2] The court cautions counsel against making factual representations that are contradicted by the record.  *See* Model Rules of Pro. Conduct r. 3.3 (Am. Bar Ass'n).

the VEC, Inc.'s Subcontractor Agreement in order to perform work for VEC, Inc." (Doc. 69-4).

Viewed in the light most favorable to VEC, this evidence creates a genuine dispute of fact about whether Joyce received the MSA prior to executing the subcontract order.

But the question raised by Defendants remains: whether the MSA, which was not signed until after work had begun, was supported by consideration. VEC promised to pay Joyce for its services, (Doc. 69-4), so consideration existed at the outset of the parties' agreement. And VEC does not assert that it offered Joyce *new* consideration at the time the MSA was signed. Thus, if the MSA can be said to form part of the original contract, it was supported by consideration; if it cannot, it was not. *See Cornell Narberth, LLC v. Borough of Narberth*, 167 A.3d 228, 238 (Pa. Commw. Ct. 2017) (quoting *In re Commonwealth Tr. Co. of Pittsburgh*, 54 A.2d 649, 651 (Pa. 1947) ("Where a legal obligation exists, a cumulative promise to perform it, unless upon a new consideration, is a nullity.")).

VEC asserts that the subcontract order "expressly incorporates the terms of the MSA." (Doc. 68 at 7). "The terms of a contract include terms in documents that a signed contract document specifically and clearly identifies and expressly incorporates by reference." *In re Estate of Atkinson*, 231 A.3d

891, 899 (Pa. 2020). The subcontract order states that "Subcontractors must meet the requirements that are on the VEC, Inc.'s Subcontractor Agreement in order to perform work for VEC, Inc." (Doc. 69-4). The court concludes that that this document's reference to the "Subcontractor Agreement" does not expressly incorporate the Master Subcontractor Agreement.

VEC also argues that Joyce accepted the MSA by starting performance on the Project. (Doc. 68 at 11). But the MSA does not refer to any specific performance, rather, it generally defines the terms of "all services performed by the Subcontractor for Contractor." (Doc. 69-5). The court therefore disagrees with the proposition that Joyce's performance on this Project, which is not referred to by the MSA, could constitute acceptance.

VEC further contends that the MSA was an "auxiliary part" of the parties' original subcontracting agreement, and that Joyce indicated its acceptance of the MSA by its execution of the subcontract order. (Doc. 68 at 11).

"The fundamental rule in construing a contract is to ascertain and give effect to the intention of the parties." *Lesko v. Frankford Hospital-Bucks County*, 15 A.3d 337, 342 (Pa. 2011). "[T]hat intention must be ascertained from the entire instrument taking into consideration the surrounding circumstances, the situation of the parties when the contract was made and

the objects which they apparently had in view and the nature of the subject matter." *Huegel v. Mifflin Constr. Co.*, 796 A.2d 350, 354 (Pa. Super. Ct. 2002) (quoting *In re Mather's Estate*, 189 A.32d 586, 589 (Pa. 1963)). "Where several instruments are made as part of one transaction they will be read together, and each will be construed with reference to the other; and this is so although the instruments may have been executed at different times and do not in terms refer to each other." *Id.* (quoting *Neville v. Scott*, 127 A.2d 755, 757 (Pa. Super. Ct. 1957)).

As discussed above, VEC has presented evidence, in the form of David Basalyga's testimony and emails to John Joyce, that Joyce was presented the MSA prior to execution of the subcontract order and letter of engagement. The MSA by its terms "control[s] and govern[s] all services performed by Subcontractor for Contractor." (Doc. 69-5 ¶1). In addition, the court considers relevant the facts that Joyce started performance on a major construction project and later executed the MSA without objection, and that the subcontract order referenced a Subcontractor Agreement. From all of this, the reasonable inference may be drawn that the parties operated under the assumption that the MSA already governed, and so was intended to form part of the parties' original agreement. The court therefore concludes that

there is a genuine dispute of material fact as to existence of consideration for, and thus the enforceability of, the MSA.

Defendants in their reply brief cite the fact that in 2017, Joyce was hired by VEC on another project but in that instance refused to execute VEC's MSA. (Doc. 70 at 3; Doc. 60 ¶28–30). So VEC said then that the parties' agreement would be controlled by "the letter." (Doc. 59-2 at 66:23–68:9). While this fact may weigh against an inference that Joyce understood the MSA to be in place here, it does not render such an inference unreasonable. It does not inevitably follow from the fact that the MSA did not govern the parties' agreement in 2017 that the same was true in 2019, for the parties' understanding of the MSA's application to their relationship may have changed in the meantime, especially if VEC continued to insist on execution of the MSA for *this* Project.

Accordingly, Defendants' motion for summary judgment as to Count I will be denied.

## 2. Counterclaim Count V

In Count V of their counterclaim, Defendants assert that VEC is equitably estopped from relying on or attempting to recover damages from Joyce based on agreements other than the subcontract order and letter of engagement. (Doc. 15 at 34 ¶¶108–09). They now argue that they are

entitled to summary judgment on this counterclaim because the MSA is unenforceable. As discussed above, the court concludes that Defendants have not shown the absence of a genuine dispute of material fact as to the enforceability of the MSA. Defendants' motion for summary judgment as to Count V of their counterclaims will therefore be denied.

### B. VEC's Liquidated Damages Recovery Against Joyce

In moving for partial summary judgment on Count I of the Complaint, Defendants also seek an order that "VEC's potential damages recoverable against Joyce for its alleged breach of contract claim are limited to $93,333.33—one-third of $280,000." (Doc. 61 at 17–18). There is no dispute that VEC's contract with Williams capped liquidated damages at $280,000. (Doc. 60 ¶53; Doc. 69 ¶53; Doc. 69-29 §7.4). VEC and Joyce's letter of engagement provides that "VEC, INC. will share all liquidated damages as well as any bonuses equally with The Hillis Group and the other subcontractor performing a scope of work. BREAKDOWN VALUE WILL BE: VEC, INC.-1/3 – THE HILLIS GROUP-1/3 – JOYCE ELECTRIC-1/3." (Doc. 2-1). Defendants thus assert that Joyce can only be liable for one third of the liquidated damages.

Defendants further contend that even if the court does not hold the MSA unenforceable, Joyce still can only be liable for up to $93,333.33 on

Count I. That is because the MSA provides that Joyce "shall be liable for any and all costs, damages, losses, or expenses incurred by [VEC] resulting from [Joyce's] delay in the performance of its Work in the same manner that [VEC] may be liable to [Williams]." (Doc. 69-5 §3). And because VEC agreed to split any liquidated damages three ways, Defendants argue, Joyce's potential damages for Count I are limited to $93,333.33. (Doc. 61 at 18–19).

VEC first responds that the damages it may seek from Joyce are not limited to the liquidated damages Williams may be entitled to recover from VEC. It contends that VEC incurred damages of more than $1,300,000 due to, among other things, the additional compensation it had to pay other subcontractors to finish the Project as a result of Joyce's default.

VEC also interprets the MSA's damages provision differently, citing the sentence which immediately follows the one quoted by Defendants. These two consecutive sentences, which form one paragraph, state:

> The Subcontractor shall be liable for any and all costs, damages, losses, or expenses incurred by the Contractor resulting from the Subcontractor's delay in the performance of its Work in the same manner that Contractor may be liable to Owner. If the Subcontractor fails to diligently pursue the Work … and if the Subcontractor shall fail to correct the situation within two (2) days after written notice is given to the Subcontractor by the Contractor, then Contractor may declare the Subcontractor in default and complete the Subcontractor's Work with its own or other forces, or supplement the Subcontractor's workforce with other forces, and charge the Subcontractor all direct costs,

- 13 -

indirect costs, and overhead and profit for completing the Subcontractor's Work.

(Doc. 69-5 §3 ¶3). Defendants do not address the second sentence in their briefs.

VEC further contends that even as to the liquidated damages portion of the alleged damages alone, it should be able to recover the full $280,000 that it paid Williams, because Joyce abandoned the Project.

In considering the parties' contract, the court heeds the Pennsylvania Supreme Court's instructions:

> The fundamental rule in contract interpretation is to ascertain the intent of the contracting parties. In cases of a written contract, the intent of the parties is the writing itself. In determining the intent of the contracting parties, all provisions in the agreement will be construed together and each will be given effect. This Court will not interpret one provision of a contract in a manner which results in another portion being annulled.

*Lesko*, 15 A.3d at 342 (Pa. 2011) (internal citations and alterations omitted).

The court finds Defendants' argument that §3 of the MSA limits VEC's potential recovery from Joyce to liquidated damages refuted by the language of that provision. VEC seeks damages resulting from Joyce's default and the subsequent need to supplement the workforce with other subcontractors. (Doc. 1 ¶¶44–46). Such recovery is expressly allowed by §3. The sentence quoted by Defendants, which holds a subcontractor liable for delay damages

- 14 -

in the same way that the Contractor may be liable to the owner, is just one potential avenue for recovery. It does not purport to limit the contractor's potential recovery from a subcontractor to exclusively those damages, especially when read together with the sentence immediately following it. The court therefore concludes that VEC's potential recovery from Joyce is not limited to the liquidated damages it paid Williams.

VEC suggests that Defendants have not properly raised the issue whether, of the liquidated damages portion alone, VEC's potential recovery from Joyce is limited to one third. (Doc. 68 at 17 n.2). The court disagrees and considers this issue necessarily raised by Defendants' argument. True, Joyce argues that the *entirety* of breach of contract damages should be limited to $93,333; but that argument is premised on its assertion that VEC can only recover as damages the liquidated damages it paid Williams. That this premise is flawed does not upend Joyce's reliance on the letter of engagement's liquidated damages–sharing provision.

As to that provision, VEC argues that it should not apply because Joyce abandoned the Project. Limitation of damages provisions have been enforced in Pennsylvania absent "willful, malicious, or reckless" conduct. *Valhal Corp. v. Sullivan Assocs., Inc.*, 44 F.3d 195, 203 (3d Cir. 1995) (quoting *Behrend v. Bell Tel. Co.*, 363 A.3d 1152, 1166 (Pa. 1976)).

Defendants first assert that this is not a limitation of liability clause at all, but rather a "liquidated damages provision." (Doc. 70 at 6). They further contend that, in any event, VEC has not asserted a claim that Joyce acted willfully, maliciously, or recklessly. (Id. at 7).

First, the court disagrees with Defendants' contention that the "willful, malicious, or reckless" exception is inapplicable because the letter of engagement does not contain a limitation of damages clause. Although the clause is not specifically labeled as such, its purpose and effect are to limit the potential liquidated damages recoverable against Joyce. (Doc. 2-1).

Second, the court considers VEC's assertion that "Joyce's abandonment of the Project" constitutes a "willful, malicious, or reckless" breach. On Wednesday, June 19, 2019, VEC sent Joyce a "second official notice" of "schedule delays and cost impact" on the Project. (Doc. 59-7 at 1–3). That letter stated that VEC had engaged with another contractor:

> Your actions have given Williams and VEC no other choice but to look for other means and methods to complete the required and necessary work within your contracted scope. VEC will be engaging with another contractor to perform/supplement this work at your expense per your agreed and signed contract. Failure to correct your lack of performance immediately and engage to perform your contracted scope may result in you defaulting in your contractual obligations.

(Doc. 59-7 at 2).[3] Joyce did not return to work on the Project after Friday, June 21, 2019. (Doc. 60 ¶50).[4] A June 21, 2019 letter from VEC to Hudson stated that "Joyce has notified VEC that at the end of the day today, they will no longer return to this project to complete it." (Doc. 59-7 at 10). That same day, VEC and Bruce & Merrilees executed a subcontract order for the completion of the power distribution line scope. (Doc. 59-7 at 7). On Monday, June 24, 2019, VEC sent a letter notifying Joyce that it was being defaulted on the Project. (Doc. 2-8). That letter further stated: "We have been notified by our site team that you have demobilized your work force and removed materials and equipment from the site starting Friday the 21st, 2019." (Id.).

---

[3] VEC's "Project Recovery Plan," dated June 20, 2019 and forwarded to Williams, stated that "The project team that will assist in this recovery plan will consist of a mix of VEC, Inc., Bruce & Merrilees Electric & Joyce Electric …. VEC Inc.'s intent is to complete this job with Joyce Electric, Bruce & Merrilees and VEC working in parallel to meet the date of July 30, 2019. (Doc. 69-10).

[4] David Jones, VEC's project manager, testified as follows:

> Q: After June 21st, 2019, did Joyce supply to VEC all of the material that was within Joyce's scope on this project?
> A: Did not supply all the material, no. Joyce removed the material when he defaulted and left the project, and received a payment and then returned what material he had, which was not much.

(Doc. 59-3 at 175: 9–15).

Joyce posits "that if VEC did not default Joyce and divert Joyce's contract balance to Bruce & Merrilees ("B&M") before Joyce left the Project, Joyce would have continued working alongside VEC and Hillis." (Doc. 70 at 8–9). To the extent this assertion implies that Joyce had no choice but to leave the Project, it is contravened by the evidence that Joyce left the Project *before* receiving the notice of default, (Doc. 59-7 at 10), and that VEC's notice to Joyce of engagement with B&M did not indicate that B&M would be replacing Joyce altogether. (Doc. 69-10).   The court concludes that this evidence creates a genuine dispute of material fact as to whether Joyce breached the contract in a willful manner by abandoning the Project and thereby forfeited reliance on the letter of engagement's liquidated damages– sharing clause.

For these reasons, the court will not grant partial summary judgment for Defendants on Count I to limit VEC's potential recovery.

### C. VEC's Claim Against Hudson

Count IV of the Complaint seeks damages from Hudson under the Subcontract Performance Bond entered between Joyce as principal and Hudson as surety, with VEC as obligee. (Doc. 1 at 10–11; Doc. 69-47). Defendants move for summary judgment in favor of Hudson on this count. (Doc. 59).

- 18 -

### 1. Notice

The Subcontract Performance Bond provides:

Whenever Principal shall be, and be declared by Obligee to be in default under the subcontract, the Obligee having performed Obligee's obligations thereunder:

(1) Surety may promptly remedy the default subject to the provisions of paragraph 3 herein, or;

(2) Obligee after reasonable notice to Surety may, or Surety upon demand of Obligee, may arrange for the performance of Principal's obligation under the subcontract subject to the provisions of paragraph 3 herein;

(3) [detailing cost allocation]

(Doc. 69-47).

Defendants argue that Count IV fails because VEC "never gave Hudson reasonable notice of Joyce's purported default and VEC's termination of Joyce's subcontract before it elected to remedy the default on its own terms." (Doc. 61 at 31). VEC contends that it did provide reasonable notice. (Doc. 68 at 21).

On June 21, 2019, VEC sent Hudson a letter stating that because of concerns about delays, VEC was "contemplating defaulting Joyce" and sought Hudson's "immediate input." (Doc. 69-34). A second June 21st letter stated that "Joyce has notified VEC that at the end of the day today, they will no longer return to this project to complete it …. VEC at this point has no other alternatives but to default Joyce on their contractual requirements to complete this contract." (Doc. 59-7 at 10).

VEC acknowledges that the June 21st correspondence was the first time it notified Hudson of Joyce's default. (Doc. 68 at 22). The same day, VEC and Bruce & Merilees executed a subcontract order for completion of the power distribution line scope. (Doc. 59-7 at 7; Doc. 60 ¶47; Doc. 69 ¶47).[5] VEC admits that it contacted B&M on June 19, 2019 about the possibility of supplementing Joyce's work. (Doc. 69 at ¶43). An internal "Project Recovery Plan" dated June 20, 2019 indicated that VEC "ha[d] Bruce & Merilees on site today doing a job walk to acquire Joyce Electric's remaining scope of work if needed." (Doc. 59-7 at 31).

Defendants assert that Hudson "did not receive from VEC any notice whatsoever of default until July 3, 2019. (Doc. 61 at 24). Jeffrey Barber, VEC's Executive Vice President, testified that VEC "finally got a hold of" Hudson via phone about within a "week or week and a half" of June 21, that he explained to Hudson's representative Chris Morkan that the project was progressing with B&M, and that Morkan said he

---

[5] While it admits that it entered a purchase order with B&M for work necessary for completion of Joyce's scope, VEC denies that on that date it intended to have B&M complete *all* the remaining work. (Doc. 69 ¶47). Even if the order was only intended to be for part of Joyce's obligation, the court considers this act to constitute "arrang[ing] for the performance of Principal's obligation," and thus an act to which "reasonable notice to Surety" was a precondition under the Performance Bond. (Doc. 69-4 at 2).

was fine with VEC continuing to engage with B&M. (Doc. 69-9 at 130:6–132:1).[6] Morkan, on the other hand, testified that during this call he did not "advise VEC to just go ahead and complete the job and bill [Hudson]" (Doc. 69-49 at 33:15–17). He also testified that he did not at that time commit on behalf of Hudson to step in and complete Joyce's work. (Id. at 32:14–18). A July 3, 2019 letter from Morkan to Barber "acknowledge[d] receipt of your letter dated June 21, 2019 and your telephone call today." (Doc. 59-7 at 5).

In sum, the parties agree that VEC contacted B&M before it notified Hudson of Joyce's default. VEC sent letters notifying Hudson on June 21st, and it executed a subcontract order with B&M on the same day.

VEC argues that "the Bond provides VEC the express right to complete Joyce's work after providing prompt notice to Hudson of Joyce's default" and that "Defendants cannot and do not articulate how

---

[6] Later in his deposition, Barber also testified as follows:

> Q: Did you offer Hudson Insurance the opportunity to step in and facilitate completion of Joyce's work?
> A: Yes, I did. And he said, no, just keep moving along. And if there's anything that we can do to help, let us know.

(Doc. 69-9 at 277:22–278:2).

VEC could have possibly provided more reasonable and prompt notice than sending notice to Hudson of Joyce's default on the same day as that default." (Doc. 68 at 20, 23) These assertions confuse the issue. First, the performance bond requires "reasonable," not "prompt," notice. Second, it provides that VEC may arrange for the performance of Joyce's obligation "*after* reasonable notice to Surety." (Doc. 69-47 (emphasis added)). Reading this provision in context with the one before it, which provides that Hudson "may promptly remedy the default," leads to the conclusion that the reasonableness of notice must depend in part on its timing relative to VEC's arrangement with other subcontractors. To interpret option (2) as allowing VEC to send a letter notifying Hudson of Joyce's default and almost immediately arrange with other subcontractors would effectively render option (1) a nullity, for VEC could thus leave Hudson with no real opportunity to remedy. Instead, the apparent purpose of allowing the obligee to arrange for performance only *after* reasonable notice to the surety is to allow the surety the option of remedying.

The court concludes that mailing a letter on the same day that it subcontracted with B&M could not have constituted reasonable notice on VEC's part. Even if the letter was delivered overnight, Hudson

would have received it *after* VEC had arranged with B&M for the performance of Joyce's obligations. That is not reasonable notice under the performance bond, which requires notice *before* such arrangement.

But "parties to a contract can waive its provisions." *Baim v. Duckert*, 620 F. Supp. 3d 207, 212 (E.D. Pa. 2022) (citing *Black Top Paving Co., Inc. v. Commonwealth*, 466 A.2d 774, 776 (Pa. Cmmw. Ct. 1983)). Waiver can be implied where an intention to waive "may be clearly inferred from the circumstances." *Den-Tal-Ez, Inc. v. Siemens Capital Corp.*, 566 A.2d 1214, 1223 (Pa. Super. Ct. 1989).

As discussed above, evidence has been presented that once it was informed of VEC's chosen course of action for completing the work, Hudson approved. (Doc. 68 at 20; Doc. 69-9 at 130:6–132:1). If that is true, a reasonable inference could be made that Hudson intended to waive its right to receive reasonable notice of Joyce's default before VEC's arrangement with other subcontractors. So there exists a genuine dispute of material fact as to VEC's performance bond claim against Hudson. Therefore, summary judgment will not be granted as to Count IV.

- 23 -

## 2. Limitation to one-third of liquidated damages

Defendants alternatively seek partial summary judgment on Count IV to limit VEC's potential recovery against Hudson. Defendants first argue that because a surety can have no greater obligation than the principal, VEC's potential recovery against Hudson, like its potential recovery against Joyce, is limited to $93,333.33. (Doc. 61 at 28). Because the court does not conclude that VEC's potential recovery against Joyce is limited to $93,333.33, (see *supra* Section III.B.), it must reject this argument. Defendants next argue that because the Subcontract Performance Bond referred to a "written agreement dated March 28, 2019" between Joyce and VEC as "the subcontract," and specifically referred only to the subcontract order, Hudson only guaranteed the subcontract order and letter of engagement, not the MSA. (Doc. 61 at 29; Doc. 69-47). The court does not find the performance bond's failure to refer to the MSA determinative, for the performance bond, unlike the MSA, is specific to this Project. And as the court concludes that there exists a genuine dispute of material fact as to whether the MSA was intended to form part of the parties' original subcontract agreement, (see *supra* Section

III.A.), to which the performance bond applies, it will not grant summary judgment on this basis.

## IV.  CONCLUSION

For the foregoing reasons, Defendants' motion for partial summary judgment, (Doc. 59), will be denied. An appropriate order will follow.


_s/ Malachy E. Mannion_
**MALACHY E. MANNION**
**United States District Judge**

**DATE: February 14, 2024**
19-2148-02