## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| VEC, INC., | |
| Plaintiff | CIVIL ACTION NO. 3:19-CV-02148 |
| v. | (MEHALCHICK, J.) |
| JOYCE ELECTRICAL, INC., et al., | |
| Defendants | |

## MEMORANDUM

On December 17, 2019, Plaintiff VEC, Inc., ("VEC"), brought this action against Joyce Electrical, Inc. ("Joyce") and its surety, Hudson Insurance Co. ("Hudson") (together, "Defendants") for Joyce's alleged breach of a subcontract relating to the construction of an electric substation and accompanying distribution line. (Doc. 1). VEC seeks judgment against Joyce in the principal amount of $1,403,035.40 and against Hudson in the principal amount of $1,123,035.40. (Doc. 114, at 113). Joyce filed a counterclaim alleging that VEC breached the subcontract between VEC and Joyce and seeks judgment in the amount of $427,567.94. (Doc. 113, at 178). Joyce also avers VEC is liable under the Pennsylvania Contractor and Subcontractor Payment Act ("CASPA") and seeks judgment in the amount of $201,915.80 plus $139,614.95 in CASPA penalties. (Doc. 113, at 178). The Court held a non-jury trial between October 21, 2024, through October 25, 2024, and between January 6, 2025, through January 13, 2025. The parties filed proposed findings of fact and conclusions of law following trial. (Doc. 113; Doc. 114).

The Court, having heard the testimony and reviewed all documentary evidence, now enters the following Findings of Fact, Conclusions of Law and Decision pursuant to Rule 52 of the Federal Rules of Civil Procedure.

**FINDINGS OF FACT**

The following findings of fact are based upon the parties' comprehensive statement of undisputed facts submitted before trial (Doc. 88, at 16-23), stipulation of the parties, as well as the credible testimony and evidence at trial.

## I. BACKGROUND

1. VEC is an Ohio-based company which provides electrical contracting services, including the construction of powerlines and electrical substations. (Doc. 88, at 16).

2. Joyce is a family-owned, full service electrical contractor from Enyon, Pennsylvania. (Doc. 88, at 16).

3. Hudson is a specialty insurer and surety that sells surety bonds to construction contractors and subcontractors. (Doc. 88, at 16).

4. This dispute arises out of a contract between Williams Field Service Company, LLC ("Williams") and VEC to construct a substation called the MacNew Substation and an accompanying distribution line. (Doc. 88, at 16).

5. VEC agreed to build both the MacNew Substation and the distribution line, which consists of approximately 2.25 miles of aboveground power lines to bring power from the existing Foltz Substation to the new MacNew Substation. (Doc. 88, at 16).

6. The MacNew Substation is owned by Williams and located in Brooklyn Township, Susquehanna County, PA. (Doc. 88, at 16).

7. On January 30, 2019, Williams invited VEC to bid on the project. (Doc. 88, at 16).

8. After being invited to bid on the project, VEC contacted Joyce, a subcontractor with whom VEC previously worked, to inquire if Joyce would be willing to subcontract on the project. (Doc. 88, at 16).

9. On February 6, 2019, Williams conducted a pre-bid meeting in Tunkhannock, Pennsylvania and representatives from both VEC and Joyce attended. (Doc. 88, at 16).

10. At this meeting, Williams provided VEC with specifications for the project, which VEC then provided to Joyce. (Doc. 88, at 16).

11. William's specifications stated Williams would supply fifty-five wooden utility poles and one 480V riser and deliver them to the project site on or around April 30, 2019. (Doc. 88, at 16).

12. These poles needed to be installed, dressed, and in some cases, anchored. (Doc. 88, at 17). Electrical wires were to be strung across these poles. (Doc. 88, at 17).

13. Williams provided drawings with their specifications which showed a right of way approximately 2.25 miles long stretching across several properties where the poles would be installed. (Doc. 88, at 18).

14. These drawings identified the locations where the poles would be installed. (Doc. 88, at 18).

15. Williams's specifications stated that work on the project would commence on April 1, 2019, and the project had a mechanical completion date by which the project was to be substantively complete of July 30, 2019. (Doc. 88, at 18).

16. If VEC mechanically completed the project early, Williams agreed to pay a bonus of $20,000 per day. (Doc. 88, at 18).

17. If the project was not mechanically competed by July 30, 2019, Williams would assess liquidated damages at a rate of $20,000 per day subject to a cap of $280,000. (Doc. 88, at 18).

18. On March 1, 2019, Joyce submitted a bid for the entire scope of work to build both the Distribution Line and the MacNew Substation. (Doc. 88, at 18).

19. After VEC received Joyce's bid, VEC asked Joyce for clarification on the logistics of their work, including their scheduled work hours, crew size, and whether Joyce included any weather days in its bid. (Doc. 88, at 18-19).

20. Joyce responded that it would work five ten-hour days per week. (Doc. 88, at 19).

21. Joyce advised VEC that the poles would need to be delivered by April 15, 2019, for Joyce to complete it distribution line work by the required July 30, 2019, mechanical completion deadline. (Doc. 88, at 19).

22. Williams awarded VEC the contract for the project on March 28, 2019. (Doc. 88, at 19).

23. Even though Joyce submitted a bid for the entire contract, VEC subcontracted construction of the substation and distribution line to two companies: Joyce and The Hillis Group, LLC ("Hillis"). (Doc. 113, ¶ 3; Doc. 114, ¶ 41); (Doc. 88, at 19).

24. VEC issued Joyce a purchase order for Joyce's scope of work in the amount of $2,437,314 and a letter of engagement. (Doc. 88, at 19).

25.    The purchase order stated: "If VEC, Inc. or the Owner encounters any monetary impact from either missed ship dates or schedule delays due to the Supplier/Subcontractor, these charges will be passed on to the Supplier/Subcontractor at fault." (Doc. 88, at 19).

26.    The letter of engagement stated that work would be performed "5 DAYS PER WEEK AT 10 HOURS PER DAY" and that "VEC, Inc. will share all liquidated damages as well as any bonuses equally with The Hillis Group and the other subcontractor performing a scope of work. BREAKDOWN WILL BE: VEC, INC.- 1/3 – THE HILLIS GROUP-1/3 – JOYCE ELECTRIC-1/3." (Doc. 88, at 19).

27.    On or about April 1, 2019, VEC requested Joyce send 1) an executed letter of engagement, 2) an executed purchase order, and 3) bonding documents along with the invoice for the Subcontract Performance Bond (the "Bond") issued by Hudson to Joyce. (Doc. 88, at 20). Joyce sent these documents the same day. (Doc. 88, at 20).

28.    On May 23, 2019, VEC sent a Master Subcontractor Agreement ("MSA") to Joyce and requested that Joyce sign and return it. (Doc. 88, at 20).

29.    On June 3, 2019, VEC advised Joyce that it did not have an executed MSA from Joyce. (Doc. 88, at 20).

30.    On June 6, 2019, Joyce submitted an application for payment for work Joyce had done on the project. (Doc. 88, at 20). VEC advised Joyce that it would not issue Joyce any payment for its work until Joyce executed the MSA agreement (Doc. 88, at 20).

31.    On June 6, 2019, VEC sent Joyce another copy of the MSA which Joyce signed and executed that same day. (Doc. 88, at 21). VEC then made its first payment to Joyce for work on the project. (Doc. 88, at 21).

32.    When Joyce executed the MSA on June 6, 2019, VEC did not offer to pay Joyce any more compensation than Joyce already had been entitled to receive by the terms of the subcontract order and letter of engagement. (Doc. 88, at 21).

33.    On June 10, 2019, VEC sent Joyce a letter stating that that Joyce was behind schedule, and under the MSA, Joyce was required to provide a recovery schedule within 48 hours. (Doc. 88, at 21).

34.    Joyce responded to VEC's letter that same day and recommended that VEC replace its project manager and request Williams grant VEC and Joyce a forty-five-day extension. (Doc. 88, at 21).

35.    On June 13, 2019, Williams sent VEC a letter stating that it was concerned that the project was behind schedule and VEC would not be able to achieve its mechanical completion by June 30, 2019. (Doc. 88, at 21).

36.   On June 19, 2019, VEC sent Joyce a letter demanding corrective actions pursuant to the MSA within 48 hours. (Doc. 88, at 21).

37.   On June 19, 2019, Joyce demanded payment from VEC for all unpaid sums for work Joyce completed on the Project. (Doc. 88, at 22).

38.   On June 20, 2019, VEC sent Williams a recovery plan which included engaging Bruce & Merrilees Electric ("B&M") to aid in the completion of the project. (Doc. 88, at 22). That same day, B&M visited the project's worksite at VEC's invitation. (Doc. 88, at 22).

39.   Joyce continued to perform work on the project until June 21, 2019. (Doc. 88, at 22). That same day, Joyce demobilized from the project. (Doc. 88, at 22-23).

40.   On June 21, 2019, VEC sent a letter to Hudson via regular mail stating "[f]or various reasons, Joyce has fallen behind on several critical path items and the project owner (Williams) is extremely concerned that [Joyce's] portion of the work will not be completed on time," and that "VEC is contemplating defaulting Joyce," and requesting Hudson to contact VEC immediately to discuss its options. (Doc. 88, at 22).

41.   Also on June 21, 2019, VEC issued B&M a purchase order for B&M to perform electrical work on the project in exchange for payment on a time and material basis. (Doc. 88, at 22).

42.   On June 24, 2019, VEC informed Joyce that VEC was defaulting Joyce from the contract. (Doc. 88, at 23).

43.   On July 3, 2019, Hudson confirmed that it received VEC's June 21, 2019. (Doc. 88, at 23). Hudson requested ten specific categories of documentation from VEC. (Doc. 88, at 23).

44.   B&M did not mobilize on the project until after July 8, 2019. (Doc. 88, at 23).

45.   VEC achieved substantial completion of the project on August 30, 2019. (Doc. 88, at 23).

46.   Williams imposed $280,000 in liquidated damages on VEC. (Doc. 88, at 23).

47.   Williams paid VEC the full amount of its contract minus the $280,000 in liquidated damages on VEC. (Doc. 88, at 23).

## II.   THE FORMATION OF THE CONTRACT AND EXECUTION OF RELEVANT DOCUMENTS

48.   After Williams invited VEC to bid on the project, VEC invited Joyce to a pre-bid meeting which John Joyce, Joyce's President, attended. (VEC Ex. 7).

49.    On March 28, 2019, Williams awarded VEC with the project and held a kickoff meeting which John Joyce attended. (VEC Ex. 357, at 3; Doc. 106, at 202; Doc. 109, at 1055). Shortly after this meeting, Joyce executed both a purchase order and letter of engagement for the project. (Doc. 88, at 20).

50.    Under the purchase order, VEC agreed to pay Joyce $2,420,710.00 for work on the project and an additional $16,604.00 to cover the cost of the performance and payment bond for a combined total of $2,437,314.000. (VEC Ex. 27, at 6).

51.    The purchase order also requires VEC to pay Joyce's invoices, less 10% retainage, within ten days of receiving payment from Williams. (VEC Ex. 27, at 6).

52.    On April 1, 2019, VEC requested Joyce submit the executed letter of Engagement, the executed purchase order, and the Bond issued by Hudson to Joyce but not an MSA. (Doc. 88, at 20). Joyce complied and submitted the documents. (Doc. 88, at 20).

53.    VEC first sent Joyce a copy of the MSA on May 23, 2019 after Joyce had already begun work on the project.[1] (VEC Ex. 29; Def. Ex. 128; Doc. 107, at 19; Doc. 109, at 795, 861, 877).

54.    On May 31, 2019, Williams moved the location of Pole 4, and VEC submitted a change order to Williams requesting Joyce be paid an addition $5,644.00 for work related to Pole 4's location change. (VEC Ex. 119; VEC Ex.120; VEC Ex. 121).

55.    The total contract price after the change order for work related to Pole 4 was $2,442,958.00. (VEC Ex. 27, at 6; VEC Ex. 119).

56.    On June 3, 2019, Basalyga followed up with John Joyce to ask him to execute the MSA. (VEC Ex. 30, at 1).

57.    By June 6, 2019, Joyce submitted its first application for payment for work performed for approximately $200,000. (Doc. 107, at 62; Doc. 109, at 861).In response, VEC informed John Joyce that it would not issue any payment until it executed the MSA. (VEC Ex. 30, at 6-7; Doc. 88, at 20).

58.    John Joyce then submitted an executed MSA on June 6, 2019. (VEC Ex. 30, at 6).

---

[1] David Basalyga ("Basalyga"), VEC's subcontract manager, testified at trial that he handed John Joyce a hard copy of the MSA on March 28, 2019. (Doc. 106, at 203). Basalyga also sent John Joyce an email on May 23, 2019, claiming he sent the MSA "when the [purchase order] was issued." (VEC Ex. 30). However, John Joyce testified at trial that Basalyga did not hand him a copy of the MSA prior to May 23, 2019, the MSA is dated May 2019, and Basalyga was unaware during cross examination of any copies of the MSA dated earlier than May 2019. (VEC Ex. 29; Def. Ex. 128; Doc. 109, at 795, 861, 877).

### III. THE PARTIES' SCOPES OF WORK AND RESPONSIBILITIES

59. Williams awarded VEC with a contract to perform all electrical and civil engineering on the distribution line and substation. (VEC Ex. 6; Def. Ex. 357, at 3; Doc. 110, at 54-55).

60. VEC awarded Hillis with a subcontract for all civil work on the project.[2] (Doc. 106, at 35; Doc. 109, at 455-56, 480, 695).

61. Hillis's work on the project included environmental work such as tree clearing and erosion and sediment control. (Doc. 106, at 35, 180-81; Doc. 109, at 455-56, at 697; Doc. 110, at 62).

62. As part of its responsibility to conduct erosion and sediment control, Hillis was required to provide matting and other equipment to prevent erosion.[3] (Def. Ex. 287, at 7-8; Doc. 106, at 37)

63. Hillis was also responsible for all concrete work on the substation. (Def. Ex. 28).

64. VEC awarded Joyce all electrical engineering work on the project. (Doc. 109, at 480).

65. Joyce's scope of work included installing the project's distribution line. (Doc. 109, at 1134-1135). This involved erecting fifty-five electric poles along a 2.25-mile-long right of way which stretched across several properties. (VEC Ex. 27, at 6; Doc. 88, at 18). Joyce was also responsible for stringing wiring across the poles and completing related electric work. (Doc. 109, at 1134-1135).

---

[2] VEC disputes that Hillis was awarded all civil work on the project. (Doc. 114, at 10-11). However, both John Jones ("Jones") and Paul Mellen ("Mellen"), the two field supervisors on the project who oversaw Joyce and Hillis's work, testified that all civil work was within Hillis's scope of work. (Doc. 106, at 35; Doc. 109, at 455-56).

[3] VEC contends that nothing in the specifications states who was responsible for providing poly matting, a type of plastic matting which allows equipment to cross wet and muddy terrain without causing severe erosion. (Doc. 114, at 43-44). However, Jones, Mellen, and Basalyga all testified that erosion control was part of Hillis's scope of work. (Doc. 106, at 35, 180-81; Doc. 109, at 455-56). Section 7.3 of the project specifications governs "Soil Erosion and Sediment Control Installation, Maintenance and Removal" and Jones testified that this section governed Hillis's scope of work. (Def. Ex. 284, at 7-9; Doc. 106, at 37). Under Section 7.3, Hillis was responsible for "all erosion and sediment control devices" and for "provid[ing] the necessary equipment and personnel to construct, maintain and remove (if required) all Erosion Control Devices (ECD's) as directed by the Company in the Work Request, based on Project Drawings, Permits, Best Management Practices (BMP's), and in accordance with any and all federal, state and local environmental requirements." (Def. Ex. 284, at 8).

66.    Williams was responsible for providing Joyce with the poles and certain electrical equipment such as transformers for the project. (Doc. 88, at 17). But outside of erosion control matting, the poles, and certain electrical equipment, Joyce was responsible for supplying its own equipment related to installing the distribution line. (Def. Ex. 23; Doc. 109, at 703-705).

67.    Joyce was required to provide fire retardant equipment for its workers.[4] (VEC Ex. 6, at 19).

68.    Joyce was also required to comply with the project's DISA drug testing requirements.[5] (VEC Ex. 11, at 7).

69.    Joyce's scope of work also involved starting up and testing the MacNew substation. (Doc. 109, at 1135).

70.    Surveying was not part of Joyce's scope of work.[6] (Def. Ex. 146, at 3; Doc. 109, at 707).

---

[4] Defendants contend Joyce was not required to provide fire retardant clothing. (Doc. 113, at 25, 119). However, the project specifications state "[a]ny individual working on or near electrical equipment" may be required to wear "Personal Protective Equipment" including "full fire retardant clothing." (VEC Ex. 6, at 19). Joyce's was awarded the electrical engineering work on the project. (Doc. 109, at 480). It thus follows that complying with the project specifications' requirements for working near electrical equipment was within Joyce's scope of work. (VEC Ex. 6, at 19).

[5] John Joyce testified that VEC was responsible for DISA drug testing compliance. (Doc. 109, at 902). However, on February 20, 2019, VEC sent John Joyce a bid addendum which states "DISA is also required for subcontractors." (VEC Ex. 11, at 7). Thus, the Court determines Joyce was responsible for compliance with DISA drug testing requirements.

[6] VEC asserts that certain surveying was part of Joyce's scope of work. (Doc. 114, at 64-65). VEC basses this assertion on Jones's testimony that John Joyce verbally stated that Joyce would be responsible for surveying and the fact that Joyce paid for surveying throughout the project. (Doc. 114, at 64-65). However, Jones and Dominic Spelich ("Spelich"), VEC's Vice President of Client Services, both admitted that the contract documents do not state Joyce was responsible for surveying. (Doc. 106, at 60-610; Doc. 108, at 10-11). John Joyce testified that surveying was never within Joyce's scope of work and that Joyce only paid for surveying because no one else would. (Doc. 109, at 707, 818). The Court credits John Joyce's testimony because the record shows that Joyce paid for surveying related to tree clearing, which was within Hillis's scope of work, not Joyce's, and thus Joyce paid for surveying outside its scope of work. (VEC Ex. 148, at 1; Doc. 105, at 88-89; Doc. 106, at 44; Doc. 110, at 94). Further, VEC never required B&M to arrange surveying even though B&M took over most of Joyce's scope of work after Joyce left the project. (Doc. 110, at 93).

71.    VEC retained responsibility over drafting and submitting safety plans to Williams, such as steep slope plans.[7] (Doc. 107, at 26-27).

72.    Williams, retained responsibility for obtaining rights of way to allow workers to access private property, creating design plans, changing design plans, and uploading design plan changes to an online file sharing service. (VEC Ex. 6; VEC Ex. 12; Def. Ex. 146, at 2-3; Doc. 109, at 535-36, 749).

## IV. COMPLICATIONS WITH POLE INSTALLATION

73.    At the start of the project, VEC and Hillis were slow to conduct surveys necessary for Joyce to begin work on the project and because of this, John Joyce offered to pay for surveys on April 3, 2019. (VEC Ex. 26; Doc. 109, at 818-19).

74.    By April 15, 2019, Williams delivered the poles to the project site, but Williams placed the poles a pad located on private property known as the "Molnar property." (Doc. 106, at 142; Doc. 109, at 54, 64-66, 1011).

75.    Williams did not obtain a right of way across the Molnar property until April 24, 2019, so Joyce could only transport the poles by driving them along a ten-mile round trip around the Molnar property. (Doc. 106, at 142; Doc. 109, at 54, 64-66, 1011).

76.    From the time the poles were delivered, the worksite experienced constant rainfall which created erosion concerns in areas which would not have required erosion control equipment in dry conditions. (Doc. 109, at 755-56).

77.    Because of this, there were certain areas Joyce could not use equipment necessary to erect poles until erosion control devices were installed. (Doc. 109, at 718-723). When Joyce attempted to do work in those areas, it had to stop because its equipment caused erosion, and the project specifications required all contractors to limit erosion. (Def. Ex. 284, at 7-9; Doc. 109, at 718-723).

78.    VEC and Hillis would not provide proper erosion control equipment in areas where muddy and wet conditions caused an enhanced risk of erosion even though Hillis, and not Joyce, was responsible for providing erosion control equipment. (Def. Ex. 284, at 7-9; Doc. 106, at 37; Doc. 109, at 718-723, 725-27).

---

[7] VEC contends that Joyce was responsible for drafting a steep slope plan. (Doc. 114, at 48). However, Basalyga and John Joyce both testified that Jones, and by extension VEC, was responsible for drafting steep slope plans. (Doc. 107, at 26-27; Doc. 109, at 807). The Court credits this testimony because VEC developed other safety plans for the project and Jones signed his emails as "Safety/Project Manager." (VEC Ex. 134; Def. Ex. 20, at 56; Doc. 109, at 807).

79.  Joyce attempted to mitigate these delays by providing poly mats. (Def. Ex. 284, at 7-9; Doc. 106, at 37; Doc. 109, at 25-26, 718-23, 725-27, 847, 859, 900).

80.  After erosion and weather-related issues caused delays, John Joyce asked VEC to submit a change order to Williams requesting a forty-five day extension due to extreme weather. (Doc. 109, at 837-38, 844-46).

81.  Joyce also could not access certain pole locations until May 2019, because they were located on private property known as the "Foltz property" and Williams did not obtain the necessary land permissions for Joyce to access the property until May 2019. (Doc. 106, at 48; Doc. 109, at 751-53).

82.  Certain pole locations were also inaccessible because there were trees along the right of way that Hillis needed to clear before Joyce could begin working on those pole installations. (Doc. 106, at 44).

83.  Further, Williams would not allow Joyce to begin work on certain poles on the project until Williams approved a safety plan for working on steep slopes which was not approved until June 2019. (Def Ex. 92; Doc. 105, at 87; Doc. 106, at 51-53; Doc. 109, at 807-809)

84.  Williams also did not finalize certain pole locations until after work on the project had already begun. (Def. Ex. 146, at 2-3; Doc. 106, at 46; Doc. 109, at 825-826). The changes to pole locations required additional surveying and Joyce would not immediately see the changes as they occurred. (Def. Ex. 146; Doc. 105, at 96; Doc. 106, at 80-83, 149; Doc. 107, at 96-97; Doc. 109, at 826-827).

## V.  WILLIAMS'S CONCERNS ABOUT THE PACE OF THE PROJECT

85.  On April 9, 2019, VEC created a schedule for the project based on Williams's pole delivery dates and VEC scheduled all poles to be installed and anchored by May 24, 2019. (VEC Ex. 36; Doc. 105, at 65-66).

86.  Joyce did not set its first pole until April 26, 2019. (Doc. 109, at 1097).

87.  By May 14, 2019, only six poles were set. (Doc. 1098).

88.  On May 17, 2019, Williams sent VEC a letter expressing concern with VEC's progress on the project and noted "VEC's current productivity will not allow VEC to meet its July 30, 2019, completion date." (VEC Ex. 63).

89.  Williams noted that VEC failed to obtain tracked equipment required to continue work on the project, VEC was not working full 50-hour work weeks, VEC failed to submit a suitable steep slope plan, and VEC failed to conduct surveys for cutting trees. (VEC Ex. 63).

90.   Williams further noted that only eleven poles were set as of May 17, 2019, whereas the pole tracker schedule VEC proposed stated that twenty-nine poles should have been set by that point. (VEC Ex. 63).

91.   Williams threatened to descope VEC from the project or terminate VEC's contract for cause. (VEC Ex. 63).

92.   Williams demanded VEC present a recovery plan outlining how VEC planned to meet the July 30, 2019, mechanical completion deadline and how VEC planned to address deficiencies in the project's productivity. (VEC Ex. 63).

93.   On May 20, 2019, VEC forwarded Williams's May 17, 2019, letter to John Joyce and asked for a meeting to discuss a recovery plan to meet the July 30, 2019, mechanical completion deadline. (VEC Ex. 65).

94.   VEC did not send a similar letter to Hillis. (Doc. 63, at 3; Doc. 106, at 44; Doc. 107, at 134-35; Doc. 110, at 94).

95.   John Joyce responded to VEC via email on May 23, 2019, and stated that a recovery plan was not necessary. (VEC Ex. 67).

96.   John Joyce also stated that the reasons pole installation was not on pace with VEC's previous schedule is because of weather related delays and changes to pole locations. (VEC Ex. 67, at 2).

97.   John Joyce's response further claimed that Joyce had all the manpower necessary to complete each day's work and the only day he did not have a full crew were days where they could not due work due to a lack of access to the right of way. (VEC Ex. 67, at 2).

98.   On May 23, 2019, VEC sent Williams a recovery plan. (VEC Ex. 69).

99.   On Wednesday May 29, 2019, John Joyce emailed VEC to inform it that he had acquired tracked equipment and that seventy-five percent of the poles would be installed by June 9, 2019. (VEC Ex. 70, at 2-3).

100.   VEC forwarded John Joyce's email to Williams on May 29, 2019. (VEC Ex. 70).

## VI. JOYCE'S EXIT FROM THE PROJECT

101.   On June 10, 2019, VEC sent Joyce a notice of schedule delays which demanded Joyce submit a corrective action plan within forty-eight hours. (VEC Ex. 75).

102.   On June 10, 2019, John Joyce responded to the notice. (VEC Ex. 76). John Joyce stated that the delays on the project were caused by Jones's poor management, extreme weather, lack of access to private property, and a lack of communication prior to the start of the product regarding the need for tracked equipment. (VEC Ex. 76, at 2-4).

103.    John Joyce's response further claimed that he properly staffed the project, his crew worked Saturdays to make up time lost due to extreme weather, and that delivery information for specialized equipment is unpredictable. (VEC Ex. 76, at 2). John Joyce recommended that VEC request a forty-five-day extension due to the extreme weather. (VEC Ex. 76, at 2-4).

104.    On June 13, 2019, Williams sent VEC another letter expressing concern that VEC would not meet the mechanical completion deadline and demanding that VEC join Williams on a conference call with the Guarantee Company of North America USA. (VEC Ex. 77).

105.    In this letter, Williams informed VEC that it was concerned about the "[l]ack of proper management of the subcontractor," a lack of equipment, and a reduction of workforce in the substation construction. (VEC Ex. 77, at 2).

106.    On June 18, 2019, John Joyce informed VEC that a Hendrix cable, a cable required to complete the distribution line, was scheduled to be delivered August 16, 2019, which angered VEC because August 16, 2019, was after the July 30, 2019, mechanical completion deadline. (VEC Ex. 62; Doc. 109, at 868).

107.    Hendrix cables typically take two weeks to arrive once ordered, however, this particular cable was placed on backorder. (VEC Ex. 62; Doc. 109, at 868).

108.    The Hendrix cable arrived by July 12, 2019, before the mechanical completion date. (Def. Ex. 199; Doc. 109, at 868, 893).

109.    On June 18, 2019, John Joyce sent VEC an email stating that Joyce finished seventy percent of the work on the project and demanding that VEC pay Joyce for that percentage of work. (VEC Ex. 73, at 2).

110.    On June 19, 2019, Williams, VEC, and VEC's surety held a call to discuss delays on the project. (Def. Ex. 162; Doc. 108, at 42).

111.    During this call, Williams noted concerns with Joyce's performance on the project. (VEC Ex. 73).

112.    On June 20, 2019, VEC submitted a recovery plan to Joyce. (Def Ex. 171).

113.    In this recovery plan, VEC stated that it brought B&M "on site today doing a job walk to acquire Joyce Electric's remaining scope of work if needed." (Def. Ex. 171, at 1).

114.    The recovery plan further stated "[VEC] does not want to remove a contractor from a site and pull their bond just as the Williams team stated they do not want to do that to VEC Inc but if necessary[,] we will have a plan in place to finish on schedule." (Def. Ex. 171, at 1).

115.    On June 20, 2019, John Joyce called Jeff Barber ("Barber"), VEC's Executive Vice President of Projects, after his crew saw a B&M truck on the worksite and asked Barber about $800,000 VEC allegedly owed Joyce. (Doc.109, at 886-87). Barber refused to immediately pay the $800,000. (Doc.109, at 886-87).

116.    Later that day, Barber sent John Joyce a letter which stated that Joyce failed properly submit payment requests and that because of deficiencies in Joyce performance, "VEC will be engaging with another contractor to perform/supplement this work at your expense per your agreed and signed contract."[8] (Def. Ex 154; Doc.109, at 886-87).

117.    Joyce demobilized from the project after installing the last pole on June 21, 2019. (Def. Ex. 192; Doc. 88, at 22-23).

118.    That same day, VEC issued a purchase order for B&M to complete all remaining electrical work on the project. (Doc. 88, at 22).

119.    VEC defaulted Joyce on June 24, 2019. (Def. Ex. 81, at 2-3; Doc. 88, at 23).

## VII.    VEC's Communications with Hudson

120.    On Friday, June 21, 2019, VEC sent a letter to Hudson informing it that "VEC is contemplating defaulting Joyce" (Def. Ex. 175).

121.    Later that same day, VEC sent Hudson a letter notifying Hudson that VEC was defaulting Joyce. (Doc. 88, at 22-23).

122.    These letters were VEC's first communications with Hudson and VEC sent them after VEC contracted with B&M on June 19, 2019. (Doc. 88, at 22-23).

123.    VEC included Hudson representatives it's June 24, 2019, notice of default sent to Joyce. (Def. Ex. 81, at 2-3).

124.    On July 3, 2019, Chris Morkan ("Morkan"), a representative from Hudson, emailed VEC to acknowledge that they received the July 21, 2019, letter. (VEC Ex. 86, at 4-5). Morkan requested VEC to send information regarding the project so Hudson can conduct an investigation. (VEC Ex. 86, at 4-5).

125.    Barber and Morkan spoke over the phone regarding Joyce's default on July 3, 2019. (Doc. 108, at 189-93; Doc. 109, at 636-37).

126.    During this conversation, Morkan did not object to VEC retaining B&M. (Doc. 108, at 190; Doc. 109, at 636-37). However, Morkan told Barber that Hudson

---

[8] Although the second corrective action letter is dated June 19, 2019, email records show that the letter was drafted on June 19, 2019, and sent on June 20, 2019. (Def. Ex. 154; Def. Ex. 167).

needed more information before it could determine how to proceed. (Doc. 108, at 190; Doc. 109, at 636-37).

127. On July 8, 2019, Morkan emailed VEC stating that he spoke with John Joyce about the situation and that he would like to meet so that the parties can come to an understanding. (VEC Ex. 86, at 3-4).

128. VEC never sent Hudson all the information Morkan requested. (Doc. 109, at 588-589).

## VIII.    VEC'S COMPLETION OF THE PROJECT

129. On June 21, 2019, VEC contracted with B&M to complete work on the distribution line. (VEC Ex. 82).

130. Hillis also took over some of work, including anchor testing, within Joyce's scope of work after Joyce left the project. (Doc. 105, at 161).

131. VEC further arranged for its own workers to come to the worksite to expedite work on the project after Joyce exited the project. (VEC Ex. 103).

132. VEC contracted with Electric Power Systems ("EPS"), a testing and engineering company, and arranged for EPS to complete testing on the substation which was within Joyce's scope of work. (VEC Ex. 102; Doc. 105, at 144).

133. Around June 28, 2019, VEC worked with Joyce to inventory all materials collected for the project. (Def. Ex 199).

134. VEC and B&M did not have all the materials they needed to complete the project, including materials needed to complete the distribution line, after Joyce left the project. (VEC Ex. 105).

## IX. VEC'S PAYMENTS TO JOYCE

135. VEC paid Joyce for three sets of payment applications which totaled $1,108,832.40. (VEC Ex. 411; Def. Ex. 267; Doc. 109, at 252-53).

136. VEC refused to pay Joyce for two additional sets of payment applications submitted after Joyce left the project which totaled $201,916.6. (Def. Ex. 267).

## X.  VEC'S COSTS TO COMPLETE THE PROJECT

137. VEC paid B&M $1,303,227.96 for labor, equipment, and materials related to completion of Joyce's scope of work after Joyce left the project. (VEC Ex. 304; VEC Ex. 400; Doc. 108, at 215; Doc. 109, at 232).

138.    VEC paid Hillis a $122,629.66 for labor, equipment, and materials to support completion of Joyce's work after Joyce left the project. (VEC Ex. 401; Doc. 109, at 232-34).

139.    VEC paid EPS $71,503.00 for testing within Joyce's scope of work after Joyce left the project. (VEC Ex. 304; VEC Ex. 402; Doc. 108, at 215).

140.    VEC paid $251,803.84 for electrical materials necessary to complete Joyce's scope of work after Joyce left the project. (VEC Ex. 304; VEC Ex. 404; Doc. 108, at 215)

141.    VEC paid $323,546.78 in labor costs for VEC's own workers to complete work within Joyce's scope of work after Joyce left the project. (VEC Ex. 304; Doc. 108, at 215).

142.    VEC paid $36,315.06 in rental fees for equipment rented to complete work within Joyce's scope of work after Joyce left the project. (VEC Ex. 405; Doc. 109, at 240).

143.    VEC paid $42,802.19 in equipment costs for VEC's equipment used to complete work within Joyce's scope of work after Joyce left the project.[9] (VEC Ex. 304; VEC Ex. 406; Doc. 109, at 242).

144.    VEC paid $15,984.21 in unanticipated costs for fuel, general conditions. materials/consumables, and lodging required to support the completion of Joyce's scope of work between June 21, 2019 and July 30, 2019.[10] (VEC Ex. 407; Doc. 109, at 245-56).

145.    VEC spent $9,394.59 for in unanticipated costs for fuel, general conditions. materials/consumables, and lodging required to support the completion of Joyce's scope of work after July 30, 2019. (VEC Ex. 408; Doc. 109, at 247).

146.    VEC spent $22,525.000 in per diem costs paid to VEC employees at a rate of $125 a day as compensation for the costs of food and lodging to complete work within Joyce's scope of work after Joyce left the project. (VEC Ex. 409; Doc. 109, at 248-49).

---

[9] VEC asserts that it paid $44,284.19 "in equipment costs for VEC's owned equipment used to complete Joyce's work." (Doc. 114, at 56). However, VEC's cost chart calculating that number includes certain costs paid before Joyce left the project. (VEC Ex. 406). When those costs are removed, the total is $42,802.19.

[10] VEC asserts that it paid $15,884,21 in these costs "for the time between June 21, 2019, when Joyce left the Project and the July 30, 2019." (Doc. 114, at 56). However, VEC's cost chart calculating that number includes costs from before Joyce left the project. (VEC Ex. 407). When those costs are removed, the total cost is $15,142.27.

**CONCLUSIONS OF LAW**

Both parties agree that the Court has diversity jurisdiction over this action pursuant to 28 U.S.C. 1332(a) because the amount in controversy exceeds $75,000 and there is complete diversity of citizenship between VEC and the Defendants. (Doc. 85, at 2; Doc. 88, at 5). VEC alleges four counts under Pennsylvania law. (Doc. 1, ¶¶ 49-65). Count I alleges Joyce breached the terms of its subcontract by abandoning the project.[11] (Doc. 1, ¶¶ 49-54).Count II alleges that Joyce is liable for unjust enrichment because VEC paid Joyce for materials that were never delivered or incorporated into the project. (Doc. 1, ¶¶ 55-58). Count III alleges that Joyce is liable for conversion because VEC paid Joyce for materials that Joyce retained. (Doc. 1, ¶¶ 59-61). Count IV alleges that Hudson failed to comply with the terms of its performance bond by failing to remedy Joyce's default, arrange for the performance of Joyce's obligations under the subcontract, and pay VEC for any costs beyond those of the unpaid subcontract balanced VEC incurred to complete Joyce's scope of work under the subcontract. (Doc. 1, ¶¶ 62-66).

Joyce brought a counter claim alleging five counts under Pennsylvania law. (Doc. 15, at 28-36). Counterclaim Count I alleges VEC breached the subcontract by defaulting Joyce under false pretenses, withholding payment for work already performed, and failing to compensate Joyce for materials and equipment. (Doc. 15, at 28-30). Counterclaim Count II alleges VEC violated CASPA by wrongly withholding payments without justification. (Doc.

---

[11] The complaint alleges Joyce is liable for breach of contract both because it failed to provide sufficient work and materials on the project, and because it abandoned the project. (Doc. 1, ¶¶ 49-54). VEC's proposed conclusions of law focus on Joyce's abandonment of the project. (Doc. 114, at 81-83).

15, at 30-31). Counterclaim Count III alleges that VEC is liable for conversion because it wrongly withheld payments. (Doc. 15, at 31-32). Counterclaim Count IV alleges VEC fraudulently induced Joyce into executing the MSA. (Doc. 15, at 32-34). Counterclaim Count V alleges VEC is equitably estopped from withholding payments from Joyce. (Doc. 15, at 34-36).

The Court will begin its analysis by discussing VEC's breach of contract claim alongside Joyce's breach of contract and CASPA counterclaims because the claim and counterclaims are closely related. The Court will then address VEC's unjust enrichment claims. The Court will next assess VEC's conversion claim and Joyce's conversion counterclaim. The Court will then turn to VEC's claims against Hudson, Joyce's fraudulent inducement counterclaim, and Joyce's equitable estoppel counterclaim. Finally, the Court will assess damages.

## I. THE BREACH OF CONTRACT AND CASPA CLAIM AND COUNTERCLAIMS

1. VEC alleges Joyce is liable for breach of contract because it abandoned the project. (Doc. 1, ¶¶ 49-54).

2. Joyce alleges that VEC is liable for breach of contract because VEC defaulted and terminated Joyce from the project in bad faith and because it withheld payments. (Doc. 15, at 28-30).

3. Joyce further avers that VEC violated CASPA by wrongly withholding payments without justification. (Doc. 15, at 30-31).

*General Principles of Contract Law*

4. "Under Pennsylvania law, '[a] breach of contract action involves: (1) the existence of a contract; (2) a breach of a duty imposed by the contract; and (3) damages.'" *Burton v. Teleflex Inc.*, 707 F.3d 417, 431 (3d Cir. 2013) (quoting *Braun v. Wal-Mart Stores, Inc.*, 24 A.3d 875, 896 (Pa. Super. Ct. 2011), *aff'd*, 630 Pa. 292, 106 A.3d 656 (2014)).

5. "A contract is formed when the parties to it 1) reach a mutual understanding, 2) exchange consideration, and 3) delineate the terms of their bargain with sufficient clarity. Consideration consists of a benefit to the promisor or a detriment to the

promisee." *Weavertown Transp. Leasing, Inc. v. Moran*, 834 A.2d 1169, 1172 (Pa. Super. Ct. 2003).

6. "A court's purpose in examining a contract is to interpret the intent of the contracting parties, as they objectively manifest it." *Sanford Inv. Co. v. Ahlstrom Mach. Holdings, Inc.*, 198 F.3d 415, 421 (3d Cir. 1999).

7. "'Where several instruments are made as part of one transaction they will be read together, and each will be construed with reference to the other; and this is so although the instruments may have been executed at different times and do not in terms refer to each other.'" *Huegel v. Mifflin Const. Co.*, 796 A.2d 350, 354–55 (Pa. Super. Ct. 2002) (quoting *Neville v. Scott*, 127 A.2d 755, 757 (Pa. Super. Ct. 1956)).

8. "'When performance of a duty under a contract is due, any nonperformance is a breach.' 'If a breach constitutes a material failure of performance, the non-breaching party is relieved from any obligation to perform.'" *Seneca Res. Corp. v. S & T Bank*, 122 A.3d 374, 379–80 (Pa. Super. Ct. 2015) (citations omitted); *see also Am. Diabetes Ass'n v. Friskney Fam. Tr.*, LLC, 177 F. Supp. 3d 855, 867 (E.D. Pa. 2016).

9. Whether a breach of contract is material is determined by five factors:

   a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;

   b) the extent to which the injured party can be adequately compensated for that part of that benefit of which he will be deprived;

   c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

   d) the likelihood that the party failing to perform or offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;

   e) the extent to which the behavior of the party failing to perform or offer to perform comports with standards of good faith and fair dealing.

   *Oak Ridge Const. Co. v. Tolley*, 351 Pa. Super. 32, 41, 504 A.2d 1343, 1348 (Pa. Super. Ct. 1985)

10. Generally, a party's abandonment of a construction project prior to the completion of the construction project is a material breach. *See Oak Ridge Const. Co.*, 504 A.2d at 1348 (finding a contractor abandoning a home construction project prior to completing construction to be a material breach); *see also Ericsson Props., LLC v. Bulle Constr., LLC*, 334 A.3d 370, at 9 (Pa. Super. Ct. 2025) (nonprecedential) (finding failing to complete a renovation project was a material breach of contract).

*The Contract Documents*

11.    There is no dispute that the purchase order, the letter of engagement, the project specifications, and the bond documents are part of the agreement between VEC and Joyce. (Doc. 113, at 18; Doc. 114, at 83).

12.    This Court previously determined that the MSA is not incorporated by reference by any existing agreement between the parties. (Doc. 73, at 8-9).

13.    This Court further previously determined that the MSA was not supported by new consideration, and thus, the MSA is only enforceable "if the MSA can be said to form part of the original contract." (Doc. 73, at 8).

14.    This Court refrained from deciding whether the MSA was part of the original contract between VEC and Defendants when assessing Defendants' motion for partial summary judgment because there was a genuine dispute of material fact regarding whether VEC presented Joyce with the MSA prior to Joyce beginning work on the project. (Doc. 73, at 6-11).

15.    However, the Court determines that VEC first presented Joyce with the MSA on May 23, 2019, after work on the project commenced. (VEC Ex. 29; VEC Ex. 30; Def. Ex. 128; Doc. 109, at 795, 861, 877).

16.    Thus, the relevant contract documents are the letter of engagement, the purchase order, the bond documents, and the project specification documents. (VEC Ex. 6; VEC Ex. 12; VEC Ex. 27; VEC Ex. 26).

*Joyce's Alleged Breach of Contract*

17.    VEC avers that Joyce breached the subcontract by departing from the project on June 21, 2019. (Doc. 114, at 81-83).

18.    The subcontract required Joyce to finish installation of the distribution line and conduct substation testing. (VEC Ex. 6; VEC Ex. 12; VEC Ex. 27; VEC Ex. 26; Doc. 109, at 1134-1135).

19.    It is undisputed that Joyce demobilized from the project on June 21, 2019, before this work was complete. (Doc. 113, at 70-71; Doc. 114, at 82).

20.    Even though Joyce concedes that it did not complete all the work required by the subcontract, it avers that it was excused from further performance under the subcontract because VEC anticipatorily repudiated the subcontract. (Doc. 113, at 129-38). This anticipatory repudiation allegedly occurred when Barber told John Joyce over the phone that VEC would withhold $800,000 in payments to Joyce because B&M was taking over much of Joyce's scope of work. (Doc. 113, at 129-38).

19

21.   An anticipatory repudiation or breach of a contract may excuse a defendant from its obligations under a contract. *See Boro Const., Inc. v. Ridley Sch. Dist.*, 992 A.2d 208, 217 (Pa. Commw. Ct. 2010); *see also Gillespie v. Dring*, 350 F. Supp. 3d 333, 338 (M.D. Pa. 2018), *aff'd*, No. 19-2073, 2022 WL 1741888 (3d Cir. May 31, 2022).

22.   "Anticipatory repudiation is a type of breach wherein a party 'entails an essential declaration of an intention to breach' the agreement." *Ruggiero v. Nocenti*, 556 F. Supp. 3d 512, 525 (E.D. Pa. 2021) (quoting *Harrison v. Cabot Oil & Gas Corp.*, 631 Pa. 268, 278, 110 A.3d 178, 184 (2015)).

23.   "'To constitute anticipatory breach [or repudiation] under Pennsylvania law there must be an absolute and unequivocal refusal to perform or a distinct and positive statement of an inability to do so.'" *Edwards v. Wyatt*, 330 F. App'x 342, 346 (3d Cir. 2009) (nonprecedential) (quoting *Edwards v. Wyatt*, 335 F.3d 261, 272 (3d Cir. 2003)); *see also Ruggiero*, 556 F. Supp. 3d at 525.

24.   A statement only constitutes anticipatory repudiation when the statement constitutes an "absolute, unequivocal refusal to perform." *Edwards*, 335 F.3d at 273 (emphasis in original); *see also EMD Performance Materials Corp. v. Marque of Brands Americas LLC*, 578 F. Supp. 3d 670, 690 (E.D. Pa. 2022).

25.   A party expressing an "honest disagreement" over the terms of an agreement is not an absolute and unequivocal refusal to perform. *Andrews v. Cross Atl. Cap. Partners, Inc.*, 2017 Pa. Super. 72, 158 (2017); *see also Graber v. Westfield Ins. Co.*, No. CV 21-3313, 2024 WL 3927211, at *4 (E.D. Pa. Aug. 23, 2024)

26.   John Joyce testified that Barber told him "[he] won't see" $800,000 that VEC owed him, and that VEC was replacing Joyce with B&M. (Doc. 109, at 886-87).

27.   After this call, Barber sent John Joyce a letter which included a statement "VEC will be engaging with another contractor to perform/supplement [work in Joyce's scope of work] at your expense." (Def. Ex. 154; Doc. 109, at 887).

28.   Even if the Court takes John Joyce's account of his conversation with Barber as true, Barber's statements over the phone Barber's letter, when read together, equivocate. (Def. Ex. 154; Doc. 109, at 886-87).

29.   Barber's letter states that Joyce failed to make proper requests for payment under the subcontract, John Joyce's demands for immediate payment are inconsistent with the subcontract, and the project is a "pay when paid" project. (Def. Ex. 154, at 2). Thus, the letter does not state that VEC would never pay Joyce, but rather implies that VEC will only pay Joyce in accordance with the protocols for payment in the subcontract.

30.   Barber's letter further states that VEC is retaining B&M to provide "support" on work within Joyce's scope of work and that VEC engaged B&M to

"perform/supplement" Joyce's work. (Def. Ex. 154, at 2). Thus, the letter does not state that VEC is replacing Joyce, but rather, bringing in an additional contractor to support Joyce.

31. Even under John Joyce's account of events, Barber made a definitive statement regarding payments and replacing Joyce over the phone, but then equivocated by sending a letter which contradicted those statements. (Def. Ex. 154; Doc. 109, at 886-87).

32. Defendants' arguments further fail because the Court cannot credit John Joyce's testimony that Barber told him VEC would no longer pay Joyce or that VEC was entirely replacing Joyce because his testimony is inconsistent with both Barber's letter and VEC's recovery plan. (Def. Ex. 154; Def. Ex. 171; Doc. 109, at 886-87). Both documents state that VEC was bringing on B&M to support Joyce rather than replace it and neither document states that Joyce was to be removed from the project or not paid for work already performed. (Def. Ex. 154; Def. Ex. 171, at 1).

33. Thus, Joyce was not excused for performing under the subcontract because VEC did not make an absolute and unequivocal statement refusing to perform. *See Boro Const., Inc.*, 992 A.2d at 218 (finding a subcontractor was not excused for performance where a contractor's statements were not absolute and unequivocal refusals to perform).

34. Joyce's breach constitutes a material breach of contract because Joyce abandoned the project before construction was complete. *See Oak Ridge Const. Co.*, 504 A.2d at 1348; *see also Ericsson Props.*, LLC, 334 A.3d 370 at 9.

35. Thus, Judgement on Count I is entered in favor of VEC. (Doc. 1, ¶¶ 49-54).

## II. VEC'S ALLEGED BREACH OF CONTRACT AND CASPA LIABILITY

36. Joyce alleges that VEC breached the subcontract by defaulting and terminating Joyce under false pretenses and withholding payments. (Doc. 15, at 28-30).

37. Similarly, Joyce alleges VEC violated CASPA by wrongly withholding payments. (Doc. 15, at 30-31).

38. These claims will be considered together because "CASPA does not supplant the traditional breach of contract action between contracting parties; it merely makes additional remedies available to contractors and subcontractors when they are not promptly paid by the party with which they contracted." *Scungio Borst & Assocs. v. 410 Shurs Lane Devs.*, 106 A.3d 103, 109 (Pa. Super. Ct. 2014), *aff'd*, 636 Pa. 621 (2016).

39. To recover under CASPA a party must first "establish a contractual right to payment pursuant to either a written or oral contract" and establish "breach of

that contract." *Scungio Borst & Assocs.*, 106 A.3d at 109; *see also STI Oilfield Servs., Inc. v. Access Midstream Partners*, No. 3:13-CV-02923, 2017 WL 889541, at *22 (M.D. Pa. Mar. 6, 2017) (finding a CASPA claim requires a breach of contract).

40.    As discussed above, Joyce materially breached the contract because it abandoned the project before construction was complete. *See Oak Ridge Const. Co.*, 504 A.2d at 1348; *see also Ericsson Props., LLC*, 334 A.3d 370 at 9.

41.    Because Joyce materially breached the project, VEC was excused from further performance and Joyce cannot prevail on its breach of contract claim. *See Oak Ridge Const. Co., 504 A.2d at 1348* (explaining that where a party materially breaches a contract, the non-breaching party is excused from further performance); *see also Am. Diabetes Ass'n*, 177 F. Supp. 3d at 867 (same).

42.    By extension, Joyce also cannot prevail on a CASPA claim because it cannot show a breach of contract. *Scungio Borst & Assocs.*, 106 A.3d at 109; *see also STI Oilfield Servs., Inc.*, 2017 WL 889541, at *22.

43.    Thus, the Court enters judgment in favor of VEC on Counterclaim Counts I and II. (Doc. 15, at 28-31).

### III. VEC's UNJUST ENRICHMENT CLAIM

44.    VEC alleges that Joyce is liable for unjust enrichment because VEC paid Joyce for materials that were never delivered or incorporated into the project. (Doc. 1, ¶¶ 55-58).

45.    To prevail on a Pennsylvania unjust enrichment claim, a plaintiff must demonstrate "(1) a benefit conferred on the defendant by the plaintiff; (2) appreciation of such benefit by the defendant; and (3) acceptance and retention of such benefit under circumstances such that it would be inequitable for the defendant to retain the benefit without payment to the plaintiff." *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 273 (3d Cir. 2010).

46.    "Under Pennsylvania law, 'the doctrine of unjust enrichment is inapplicable when the relationship between parties is founded upon a written agreement or express contract.'" *Reynolds v. Univ. of Pennsylvania*, 483 F. App'x 726, 734 (3d Cir. 2012) (quoting *Wilson Area Sch. Dist. v. Skepton*, 586 Pa. 513, 519 (2006)).

47.    While the parties dispute whether the MSA is enforceable, there is no dispute that this case involves a written contract. (Doc. 113, at 18; Doc. 114, at 83).

48.    VEC fails to provide any argument as to why the doctrine of unjust enrichment is applicable to this case despite the existence of a written and express contract between the parties.

49.    Because a written contract and express agreement governs the relationship between the parties, the doctrine of unjust enrichment is inapplicable. *See Reynolds*, 483 F. App'x at 734.

50.    Accordingly, the Court grants judgment in favor of Joyce regarding Count II. (Doc. 1, at 9-10).

## IV. THE CONVERSION CLAIMS AND COUNTERCLAIMS

51.    VEC alleges Joyce is liable for conversion because VEC paid for certain materials which Joyce never provided. (Doc. 1, ¶¶ 59-61).

52.    Joyce alleges that VEC is liable for conversion because VEC withheld payments from Joyce in which Joyce is entitled to. (Doc. 15, at 31-32).

53.    Conversion is "'the deprivation of another's right of property in, or use or possession of, chattel, or other interference therewith, without the owner's consent and without lawful justification.' A person may incur liability for conversion by '[u]nreasonably withholding possession from one who has the right to it.'" *PTSI, Inc. v. Haley*, 2013 PA Super 130, 71 A.3d 304, 314 (2013) (citations omitted).

54.    However, a plaintiff may not bring a conversion claim where "alleged entitlement to the chattel arises solely from the contract between the parties." *Brown & Brown, Inc. v. Cola*, 745 F. Supp. 2d 588, 622 (E.D. Pa. 2010); *see also Figueroa v. Point Park Univ.*, 553 F. Supp. 3d 259, 277 (W.D. Pa. 2021) (stating "a plaintiff may not ordinarily recover for the tort of conversion for a breach of duty that simply restates a contractual obligation").

55.    VEC's right to equipment provided by Joyce is governed by the agreement between the parties. (Def. Ex. 23; Doc. 109, at 703-705).

56.    Similarly, Joyce's right to payments is governed by the agreement between VEC and Joyce. (VEC Ex. 27, at 5).

57.    Thus, neither party can recover based on a theory of conversion because their "alleged entitlement to the chattel arises solely from the contract between the parties." *Brown & Brown, Inc.*, 745 F. Supp. 2d at 622; *see also Figueroa*, 553 F. Supp. 3d at 277.

58.    Judgment is entered in favor of Joyce regarding Count III of the complaint. (Doc. 1, ¶¶ 59-61).

59.    Judgment is entered in favor of VEC regarding Counterclaim Count III. (Doc. 15, at 31-32).

### V. **VEC's Claim Against Hudson**

60.    VEC alleges that Hudson failed to honor its obligations to VEC pursuant to the performance bond by failing to remedy Joyce's default, failing to arrange for the performance of Joyce's obligations under the subcontract, and failing to pay VEC for any costs VEC incurred for work within Joyce's scope of work under the subcontract. (Doc. 1, at ¶¶ 62-65).

61.    The subcontract performance bond states:

> Whenever Principal shall be, and be declared by Obligee to be in default under the subcontract, the Obligee having performed Obligee's obligations thereunder:
>
> (1) Surety may promptly remedy the default subject to the provisions of paragraph 3 herein, or;
>
> (2) Obligee after reasonable notice to Surety may, or Surety upon demand of Obligee, may arrange for the performance of Principal's obligation under the subcontract subject to the provisions of paragraph 3 herein;
>
> (3) The balance of the subcontract price, as defined below, shall be credited against the reasonable cost of completing performance of the subcontract. If completed by the oblige, and the reasonable cost exceeds the balance of the subcontract price, the surety shall pay the Obligee such excess, but in no event shall the aggregate liability of the Surety exceed the amount of this bond. If the Surety arranges completion or remedies the default, that portion of the balance of the subcontract price as may be required to complete the subcontract or remedy the default and to reimburse the Surey for its outlays shall be paid to the Surety at the times and in the manner as said sums would have been payable to Principal had there been no default under the subcontract. The term "balance of the subcontract price," as used in this paragraph, shall mean the total amount payable by Obligee to Principal under the subcontract and any amendments thereto, less the amounts heretofore properly paid by Obligee under the subcontract.

> (VEC Ex. 27, at 2)

62.    This Court previously determined that based on this language, the performance bond requires reasonable notice of default and "provides that VEC may arrange for the performance of Joyce's obligation 'after reasonable notice to Surety.'" (Doc. 73, at 22) (emphasis in original) (quoting (Doc. 69-47)).

63.    This Court also previously determined that VEC failed to provide Hudson with reasonable notice of default because it did not provide Hudson notice of potential

default before contracting with B&M to supplement/perform work within Joyce's scope of work. (Doc. 73, at 21-23).

64. However, this Court declined to grant summary judgment on Count IV because there was a genuine dispute of fact regarding whether Hudson waived the reasonable notice provision. (Doc. 73, at 23).

65. "Parties to a contract can waive its provisions. A contractual waiver, which can be express or implied, is the intentional and voluntary relinquishment or abandonment of a known contractual right." *Baim v. Dukart*, 620 F. Supp. 3d 207, 212 (E.D. Pa. 2022) (citations omitted); *see also* Doc. 73, at 23.

66. "An implied waiver exists when there is either an unexpressed intention to waive, which may be clearly inferred from the circumstances, or no such intention in fact to waive, but conduct which misleads one of the parties into a reasonable belief that a provision of the contract has been waived." *Den-Tal-Ez, Inc. v. Siemens* Cap. Corp., 566 A.2d 1214, 1223 (Pa. Super. Ct. 1989); *see also Ernest Bock & Sons, Inc. v. City of Philadelphia*, 239 A.3d 1144 (Pa. Commw. Ct. 2020) (nonprecedential).

67. Implied waiver does not occur where a party's statements or conduct "do not suggest that the [party] would not require [the counter party] to comply with the [c]ontract's requirement[s]." *Ernest Bock & Sons, Inc.*, 239 A.3d 1144 at 11.

68. VEC avers that Hudson waived the notice requirement by approving of VEC's plan to retain B&M. (Doc. 114, at 104).

69. However, Morak, a Hudson representative, testified that he told Barber that he did not have enough information regarding the project to determine whether VEC was justified in retaining B&M. (Doc. 109, at 636-37).

70. Morak's testimony is consistent with his emails requesting information from VEC. (VEC Ex. 146).

71. Morak's testimony is also consistent with Barber's testimony that Morak told him that he was going to send "a letter of things that I'm going to need to move forward." (Doc. 108, at 190).

72. Thus, Hudson never approved of VEC's plan to retain B&M or took any actions suggesting it waived the performance bond agreement's reasonable notice requirement. (Doc. 109, at 636-37).

73. Because VEC failed to comply with the performance bond's reasonable notice requirement and Hudson did not waive the reasonable notice requirement, VEC cannot recover damages from Hudson. (Doc. 73, at 18-23).

74. The Court grants judgment in favor of Hudson regarding Count IV. (Doc. 1, at ¶¶ 62-65).

## VI. Joyce's fraudulent inducement Counterclaim

75. Counterclaim Count IV alleges VEC fraudulently induced Joyce into executing the MSA. (Doc. 15, at 32-34).

76. To succeed on a fraudulent inducement claim, a party must establish "(1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) resulting injury proximately caused by the reliance." *Porreco v. Porreco*, 571 Pa. 61, 69 (2002); *see also Lemons v. Meguerian*, No. CV 21-1737, 2022 WL 1289128, at *4 (E.D. Pa. Apr. 29, 2022).

77. According to Joyce, VEC fraudulently induced Joyce into signing the MSA under duress. (Doc. 113, at 157).

78. Joyce concludes that "[a]s a result of VEC's fraud and the economic duress VEC imposed on Joyce, the MSA is void and unenforceable." (Doc. 113, at 157).

79. Joyce does not provide any evidence or arguments as to why it suffered "resulting injury proximately caused by [Joyce's] reliance" on VEC's misrepresentations. *Porreco*, 571 Pa. at 69.

80. Because Defendants fail to present any argument as to why they suffered injury due to VEC's fraudulent inducement regarding the MSA, VEC is entitled to judgment in its favor. *See Wong v. RWJ Barnabas Health*, No. 23-2844, 2024 WL 4971949, at *3 (3d Cir. Dec. 4, 2024) (nonprecedential) (stating a party is "entitled to judgment as a matter of law when the non-moving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof'") (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); *see also Porreco*, 571 Pa. at 69 (stating that "resulting injury proximately caused by the reliance" is an essential element of fraudulent inducement).

81. The Court enters judgment in favor of VEC on Counterclaim Count IV. (Doc. 15, at 32-34).

## VII.    Joyce's Equitable Estoppel Counterclaim

82. Counterclaim Count V alleges VEC is equitably estopped from withholding payments from Joyce. (Doc. 15, at 34-36).

83. "Equitable estoppel is a doctrine that prevents one from doing an act differently than the manner in which another was induced by word or deed to expect." *Novelty Knitting Mills, Inc. v. Siskind, 500 Pa. 432, 435 (1983).*

84. "Equitable estoppel is not a separate cause of action and can only be raised as an affirmative defense or 'as grounds to prevent the defendant from raising a particular defense.'" *Siegel v. Goldstein*, 657 F. Supp. 3d 646, 662 (E.D. Pa. 2023),

*aff'd*, No. 23-1495, 2024 WL 1596677 (3d Cir. Apr. 12, 2024) (quoting *Carlson v. Arnot-Ogden Mem'l Hosp.*, 918 F.2d 411, 416 (3d Cir. 1990)); *see also Abira Med. Lab'ys LLC v. Meritain Health, Inc.*, No. CV 24-3140, 2025 WL 920260, at *3 (E.D. Pa. Mar. 26, 2025)).

85.   VEC is entitled to judgment on Counterclaim Count V because Defendants cannot assert a separate cause of action based on equitable estoppel. *See Siegel*, 657 F. Supp. 3d at 662; *see also Abira Med. Lab'ys LLC*, 2025 WL 920260, at *3.

86.   The Court enters judgment in favor of VEC on Counterclaim Count V. (Doc. 15, at 34-36).

## VIII.   DAMAGES

87.   VEC seeks to recover the full $280,000 it paid Williams in liquidated damages for failing to meet the July 30, 2019, mechanical completion deadline along with $1,123,035.40 in additional costs VEC allegedly incurred in remedying Joyce's breach of contract. (Doc. 114, at 87).

88.   It is a well-settled principal of contract law that a party asserting the breach "has the burden of proving damages resulting from the breach." *Spang & Co. v. U.S. Steel Corp.*, 545 A.2d 861, 866 (Pa. 1988); *see also Butch-Kavitz, Inc. v. Mar-Paul Co. Inc.*, No. 3:14-CV-00159, 2015 WL 7736761, at *17 (M.D. Pa. Dec. 1, 2015). Damages are "not recoverable if they are too speculative, vague or contingent and are not recoverable for any loss beyond an amount that the evidence permits to be established with reasonable certainty." *Spang & Co.*, 545 A.2d at 866; *see also Butch-Kavitz, Inc.*, 2015 WL 7736761, at *17.

89.   "The law does not require mathematical precision when calculating damages." *E. Coast Paving & Sealcoating, Inc. v. N. Allegheny Sch. Dist.*, 111 A.3d 220, 233 (Pa. Commw. Ct. 2015); *see also Butch-Kavitz, Inc.*, 2015 WL 7736761, at *17. Indeed, "if the facts afford a reasonably fair basis for calculating how much [a party] is entitled to[,] such evidence cannot be regarded as legally insufficient to support a claim for compensation." *Lach v. Fleth*, 64 A.2d 821, 827 (Pa. 1949); *see also Butch-Kavitz, Inc.*, 2015 WL 7736761, at *17.

90.   "The purpose of damages in contract actions is to return the parties to the position they would have been in but for the breach." *Birth Ctr. v. St. Paul Companies*, Inc., 567 Pa. 386, 400 (2001); *see also Shapiro v. Koenig Contracting, Inc.*, No. 679 EDA 2011, 2013 WL 11256793, at *9 (Pa. Super. Ct. July 26, 2013).

91.   The proper measure of damages in a case where the subcontractor walked off the job after completing only a portion of the work required by its agreement is the difference between the contract price and cost of completing the work left undone. *See Douglass v. Licciardi Const. Co.*, 386 Pa. Super. 292, 297 (1989) (stating "Pennsylvania courts, consistently therewith, have generally allowed damages for incomplete or defective performance of a building contract to be measured by the

cost of completing the work or correcting the defects by another contractor"); *see also Butch-Kavitz, Inc.*, 2015 WL 7736761, at *17. Stated differently, damages are calculated as the difference between the amount remaining due and owing under the subcontract agreement and the actual cost of completing the work required by the subcontract. *Douglass v. Licciardi Const. Co.*, 562 A.2d at 916 (1989); *see also Butch-Kavitz, Inc.*, 2015 WL 7736761, at *17.

*Liquidated Damages*

92.   VEC argues that Joyce is liable for the full $280,000 in liquidated damages Williams imposed on VEC because Joyce caused VEC's failure to meet the mechanical completion deadline. (Doc. 114, at 85-87).

93.   Defendants aver that the letter of engagement has a liquidated damages provision which limits VEC's potential recovery to one third of $280,000 or $93,333.33. (Doc. 113, at 162).

94.   A liquidated damages clause is a provision in which the parties to a contract agree to a set sum of damages which a nonbreaching party will recovery in the event of a breach. *See Pantuso Motors, Inc. v. Corestates Bank, N.A.*, 568 Pa. 601, 608 (2002); *see also Meyer-Chatfield v. Century Bus. Servicing, Inc.*, 732 F. Supp. 2d 514, 522 (E.D. Pa. 2010).

95.   "In Pennsylvania, liquidated damages clauses are enforceable if at the time the parties formed the contract, the amount of the liquidated damages constituted a reasonable approximation of the expected loss." *Zemenco, Inc. v. Devs. Diversified Realty Corp.*, 205 F. App'x 82, 86 (3d Cir. 2006) (nonprecedential); *see also Meyer-Chatfield*, 732 F. Supp. 2d at 522.

96.   However, as this Court previously noted, Courts interpret liquidated damages provisions under traditional rules of contract interpretation and read the provision consistent with the intent of the parties as expressed by the terms of the contract. (Doc. 73, at 14); *see also Merrill Iron & Steel, Inc. v. Blaine Constr. Corp.*, No. CV 14-221, 2016 WL 704706, at *6 (W.D. Pa. Feb. 23, 2016) (determining based on the language of a contract that the parties only intended a liquidated damages provision to apply to a certain type of breach of contract).

97.   Williams's contract with VEC provided that if the project was not mechanically completed by July 30, 2019, Williams would impose $20,000 per day in liquidated damages subject to a cap of $280,000. (Doc. 88, at 18).

98.   The letter of engagement provides:

Per the contract from Williams governing this project Liquidated Damages and Bonuses are present, [VEC] will share all liquidated damages as well as any bonuses equally with [Hillis] and the other

28

subcontractor performing a scope of work. BREAKDOWN WILL BE: [VEC]-1/3/ - [Hillis] – 1/3 – [Joyce] – 1/3.

(VEC Ex. 28).

99.   Based on the text of this provision, it is clear the intent of the parties was not to impose a liquidated damages provision that applies to all potential breaches of contract, but rather, "share all liquidated damages [imposed by Williams] as well as any bonuses [awarded by Williams] equally" between VEC, Hillis, and Joyce. (VEC Ex. 28).

100.  Thus, based on the intent of the parties as determined by the text of the agreement, the Court rejects Joyce's argument that this provision limits VEC's potential recover to $93,333.33. (Doc. 113, at 162).

101.  However, the Court also rejects VEC's argument that it is entitled to the full $280,000 it paid to Williams. (Doc. 114, at 85-87).

102.  The relevant material breach of contract in this case is Joyce abandoning the project, and VEC is entitled to damages which place it in the "position [it] would have been in" had Joyce not abandoned the project. *Birth Ctr. v. St. Paul Companies, Inc.*, 567 Pa. at 400; *see also Shapiro*, 2013 WL 11256793, at *9.

103.  VEC's own expert witness, George Ellis ("Ellis"), testified that Joyce, VEC, and Hillis would not have achieved mechanical completion regardless of whether Joyce stayed on the project. (Doc. 109, at 205-06).

104.  The original schedule for the project determined that all poles must be installed and anchored by May 24, 2019, to meet the mechanical completion deadline, but the final pole was not installed until June 21, 2019. (VEC Ex. 36; Def. Ex. 192; Doc. 88, at 22-23; Doc. 105, at 65-66).

105.  Thus, the Court finds that Williams would have imposed $280,000 in liquidated damages regardless of whether Joyce breached the subcontract by leaving the project. If this happened, under the letter of engagement, VEC would have only been entitled to one third of those liquidated damages from Joyce. (VEC Ex. 28).

106.  VEC avers that Joyce was solely responsible for Williams imposing the $280,000 in liquidated damages. This argument fails for two reasons.

107.  First, Joyce was not solely responsible for VEC's failure to meet the mechanical completion deadline. As discussed above, Joyce's work was delayed by delays in obtaining access to property, VEC and Hillis's failure to provide matting and other erosion control devices, delays in tree clearing, delays in surveying, delays in VEC submitting a steep slope plan, and changes in pole locations and design

drawings.[12] (Def. Ex. 146; Def. Ex. 284, at 7-9; Doc. 105, at 96; Doc. 106, at 37, 48, 80-83, 142, 149; Doc. 107, at 96-97; Doc. 109, at 54, 64-66, 718-23, 725-27, 751-53, 755-56, 823-27, 1011).

108.    Further, the text of the letter of engagement states that VEC, Hillis, and Joyce "will share all liquidated damages as well as any bonuses equally," and does not have a provision stating that if one party is at fault, they must pay all the liquidated damages. (VEC Ex. 28).

109.    Thus, the Court determines that VEC is only entitled to $93,333.33 relating to the liquidated damages VEC paid Williams because that is all they would have recovered had Joyce remained on the project.

*Remaining Damages*

110.    According to VEC, VEC paid $3,564,389.40 to complete work on Joyce's scope of work on the project and would have only paid $2,441,354.40 had Joyce completed its work. (Doc. 114, at 84-85). Thus, VEC avers that it is entitled to recover $1,123,035.40 in damages related to the work required to complete work within Joyce's scope of work.

111.    However, VEC cannot recover damages which put it in a better position than it would have been in had Joyce complied with the contract and certain numbers within VEC's damage calculations do just that. *See Birth Ctr. v. St. Paul Companies, Inc.*, 567 Pa. at 400; *see also Shapiro*, 2013 WL 11256793, at *9.

112.    For example, VEC seeks to recover damages relating to survey work. (Doc. 114, at 105-06). However, as discussed above, surveying was not part of Joyce's scope of work. (Def. Ex. 146, at 3; Doc. 109, at 707).

113.    Also as discussed above, VEC's calculations of equipment and miscellaneous costs include costs incurred before Joyce left the project. (VEC Ex. 406; VEC Ex. 407; Doc. 114, at 105-06).

114.    VEC's cost estimation also includes an 11.73% "markup" which Ellis testified was included because a "contractor deserves to get overhead and profit for the work that they perform." (Doc. 109, at 250). However, the purpose of damages in a breach of contract action is not to award profit but to put the non-breaching party in the same position they would have been had there been no breach. *See Birth Ctr.*

---

[12] Ellis testified that in his expert opinion, Joyce was solely responsible for the delays on the project. (Doc. 109, at 138-39). However, Ellis's opinion was based on several flawed assumptions that Joyce was responsible for activities outside of its scope of work such as surveying and certain erosion control activities such as providing matting. (Doc. 109, at 308-09, 355-57).

*v. St. Paul Companies, Inc.*, 567 Pa. at 400; *see also Shapiro*, 2013 WL 11256793, at *9. As such, VEC is not entitled to damages which include this markup.

115.   VEC's damages calculations are also based on its assertion that VEC issued a second change order to Joyce for $4,040.00 to cover the cost to relocate Pole 4. (Doc. 114, at 70). However, the change order was for $5,644.00. (VEC Ex. 27, at 6; VEC Ex. 119).

116.   The Court concludes that it cost VEC $2,198,890.35 to complete Joyce's scope of work after Joyce left the project. (VEC Ex. 304; VEC Ex. 304; VEC Ex. 400; VEC Ex. 401; VEC Ex. 402; VEC Ex. 404; VEC Ex. 405; VEC Ex. 406; VEC Ex. 407; VEC Ex. 408; VEC Ex. 409). This amount is comprised of:

| | |
|---|---|
| Payments to B&M | $1,303,227.96 |
| Payments to Hillis | $122,629.66 |
| Payments to EPS | $71,503.00 |
| Materials Costs | $251,803.84 |
| VEC Worker Labor Costs | $323,546.78 |
| Rental Fees | $36,315.06 |
| Use of VEC's Equipment | $42,802.19 |
| Costs relating to fuel, general conditions, materials/consumables, and lodging between June 21, 2019, and July 30, 2019 | $15,142.27 |
| Costs relating to fuel, general conditions, materials/consumables, and lodging from after July 30, 2019 | $9,394.59 |
| Per diem costs paid to VEC employees at a rate of $125 a day as compensation for the costs of food and lodging to complete | $22,525.00 |

117.   VEC paid Joyce $1,108,832.40 of the total $2,442,958.00 contract price, so had Joyce completed the project, VEC would have paid Joyce an additional $1,334,125.60. (VEC Ex. 411; Doc. 109, at 252-53). The Court will subtract that number from the $2,198,890.35 in costs VEC incurred to complete Joyce's scope

of work because VEC would have had to pay it regardless. This reduces VEC's total costs to $864,764.75.

118. Williams also paid VEC $9,416.27 in change orders for work within Joyce's scope of work. (VEC Ex. 410; Doc. 109, at 250-51). Subtracting that amount, reduces VEC's total costs to $855,348.48.

119. Further, while Joyce's material breach of contract rendered the compensation provisions of the subcontract unenforceable, Joyce is still is "'entitled to restitution for any benefit that [it] conferred by way of part performance or reliance in excess of the loss that [it] has caused by [its] own breach.'" *Alstom Power, Inc. v. RMF Indus. Contracting, Inc.*, 418 F. Supp. 2d 766, 779 (W.D. Pa. 2006) (quoting Restatement (Second) of Contracts § 374 (1981)); *see also Oak Ridge Const. Co.*, 504 A.2d at 1348 (finding that a contractor who breached a contract by abandoning a construction project was still entitled to restitution for work performed on the construction cite).

120. As discussed above, providing matting and other erosion control devices was outside of Joyce's scope of work. (Def. Ex. 287, at 7-8; Doc. 106, at 37). VEC nonetheless required Joyce to provide $114,584.01 worth of matting and labor related to placing that matting. (Def. Ex. 264; Doc. 109, at 900-01).

121. As discussed above, survey work was outside of Joyce's scope of work. (Def. Ex. 146, at 3; Doc. 109, at 707). VEC nonetheless required Joyce to pay for $8,264.93 of survey work. (Def. Ex. 293; Doc. 109, at 818-19).

122. As discussed above, concrete work on the substation was not part of Joyce's scope of work. (Def. Ex. 28). VEC nonetheless required Joyce to pay for $7,281.56 worth of concrete for the substation. (Def. Ex. 265; Doc. 109, at 904-05).

123. Given that VEC received a benefit from requiring Joyce to pay these costs despite them being outside of Joyce's scope of work, the Court will subtract this benefit from the loss Joyce caused with its breach of contract.[13] *Alstom Power, Inc.*, 418 F.

---

[13] Defendants also assert Joyce's costs associated with providing tracked equipment, fire-retardant clothing, and complying with DISA drug testing requirements were outside of Joyce's scope of work. (Doc. 113, a 119). Regarding tracked equipment, although John Joyce testified that he was not required to provide tracked equipment, it is clear from both John Joyce's own testimony and email records that Joyce was responsible for providing equipment required to install the distribution line. (Def. Ex. 23; Doc. 109, at 703-705, 802-04, 1049-50). As discussed below, the Court also finds that Joyce was responsible for costs associated with providing fire-retardant clothing and DISA drug testing compliance. (VEC Ex. 6, at 19; VEC Ex. 11, at 7). Accordingly, the Court will not subtract these costs from VEC's costs to complete the project. The Court will also not subtract the costs of Joyce's unpaid invoices. (VEC Ex. 267). These invoices were for work on the distribution line and any payments of those invoices would have contributed to the $1,334,125.60 VEC would have paid Joyce had

Supp. 2d at 779 (W.D. Pa. 2006); *see also Oak Ridge Const. Co.*, 351 Pa. Super. at 42.

124.    Thus, the Court determines VEC is entitled to $725,217.98 in damages relating to costs associated with completing work within Joyce's scope of work after Joyce left the project.

125.    Between the $93,333.33 in liquidated damages and the $725,217.98 in costs associated with completing work within Joyce's scope of work, VEC is entitled to $818,551.31 in damages.

### *Prejudgment and Post Judgment Interest*

126.    VEC asserts it is entitled to a prejudgment interest of 6% from December 19, 2019, to the date of judgment and "post judgment interest at the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date on which judgment is entered." (Doc. 114, at 113-14).

127.    State law governs awards of prejudgment interest for diversity actions. *See Travelers Cas. & Sur. Co. v. Ins. Co. of N. Am.*, 609 F.3d 143, 172 (3d Cir. 2010) (applying Pennsylvania law); *see also Lomma v. Ohio Nat'l Life Assurance Corp.*, No. 3:16-CV-2396, 2018 WL 8344840, at *1 (M.D. Pa. Aug. 20, 2018) (same).

128.    A nonbreaching party in a breach of contract action is entitled to prejudgment interest where "breach consists of a failure to pay a definite sum in money or to render a performance with fixed or ascertainable monetary value." Restatement (Second) of Contracts § 354 (1981); *see also Cresci Const. Servs., Inc. v. Martin*, 2013 Pa. Super. 66, 64 (2013) (applying the restatement).

129.    "[U]nder Pennsylvania law, where a plaintiff prevails in a contract action pertaining to 'a definite sum,' prejudgment interest is available as a matter of right starting from when the amount due under the contract was initially withheld." *Travelers Cas. & Sur. Co.*, 609 F.3d at 172; *see also Domus BWW Funding, LLC v. Arch Ins. Co.*, No. 2:23-CV-00094, 2024 WL 4643086, at *1 (E.D. Pa. Oct. 31, 2024).

130.    Pennsylvania law imposes a simple six percent prejudgment interest rate per annum in cases where "the parties have not specified another rate." *Carroll v. City of Philadelphia, Bd. of Pensions & Ret. Mun. Pension Fund*, 735 A.2d 141, 146 (Pa. Commw. Ct. 1999); *see also Lomma*, 2018 WL 8344840, at *1.

131.    Unlike prejudgment interest, post judgment interest is governed by federal statute in diversity cases. *See Pierce Assocs., Inc. v. Nemours Found.*, 865 F.2d 530, 548 (3d Cir. 1988) (applying federal law to post judgment interest in a diversity case); *see*

---

it stayed on the project. Because the Court has already subtracted that number, the unpaid invoices are already accounted for in the Court's calculations.

*also Rhino Servs., LLC v. DeAngelo Contracting Servs.*, LLC, No. CV 21-3840, 2023 WL 5186254, at *7 (E.D. Pa. Aug. 11, 2023) (same).

132. Under 28 U.S.C.A. § 1961, post judgment interest "shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding." *See also Rhino Servs., LLC v. DeAngelo Contracting Servs.*, LLC, No. CV 21-3840, 2023 WL 5186254, at *7 (E.D. Pa. Aug. 11, 2023).

133. Here the Court grants VEC's request for prejudgment interest at a rate of six percent annum from December 19, 2019, to the date of judgment. (Doc. 114, at 113-14).

134. Under the purchase order, Joyce agreed to perform construction and electric engineering services worth a predetermined monetary value. (VEC Ex. 27, at 6). Thus, VEC is entitled to prejudgment interest because Joyce's breach of contract in failing to complete its work on the project "consists of a failure to. . . render a performance with fixed or ascertainable monetary value." Restatement (Second) of Contracts § 354 (1981); *see also Cresci Const. Servs., Inc.*, 2013 PA Super at 64.

135. The prejudgment interest rate is set at six percent because the parties did not agree to another number. *See Carroll*, 735 A.2d at 146; *see also Lomma*, 2018 WL 8344840, at *1.

136. Under 28 U.S.C.A. § 1961, VEC is also entitled to post judgment interest "calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding." *See also Rhino Servs., LLC*, No. CV 21-3840, 2023 WL 5186254, at *7.

*Mitigation of Damages*

137. Defendants aver that VEC is not entitled to any damages because it failed to mitigate its damages. (Doc. 113, at 162-69).

138. "It is well established that a party who suffers a loss due to the breach of a contract has the duty to make reasonable efforts to mitigate his losses." *Somerset Cmty. Hosp. v. Allan B. Mitchell & Assocs., Inc.*, 685 A.2d 141, 150 (Pa. Super Ct. 1996).

139. "All that is required to mitigate damages is to make 'an honest, good-faith effort.'" *Merrell v. Chartiers Valley Sch. Dist.*, 51 A.3d 286, 298 (Pa. Commw. Ct. 2012) (quoting *Circle Bolt & Nut Co. v. Pennsylvania Hum. Rels. Comm'n*, 954 A.2d 1265, 1271 (Pa. Commw. Ct. 2008)).

140. Failure to mitigate "is an affirmative defense, for which the breaching party bears the burden of proof." *Prusky v. ReliaStar Life Ins. Co.*, 532 F.3d 252, 258 (3d Cir. 2008).

141. "To prove a failure to mitigate, one must show: '(1) what reasonable actions the plaintiff ought to have taken, (2) that those actions would have reduced the damages, and (3) the amount by which the damages would have been reduced.'" *Prusky v. ReliaStar Life Ins. Co.*, 532 F.3d at 258–59 (quoting *Koppers Co. v. Aetna Cas. & Sur. Co.*, 98 F.3d 1440, 1448 (3d Cir. 1996)); *see also Polit v. Grey Flannel Auctions, Inc.*, 567 F. Supp. 3d 505, 520 (M.D. Pa. 2021).

142. Defendants fail on the first requirement.

143. Defendants posit that VEC could have mitigated damages by requesting a forty-five-day extension to complete work as Joyce suggested or by continuing to work with Joyce. (Doc. 113, at 168).

144. Regarding the extension, John Joyce suggested VEC request a forty-five-day extension because of extreme weather. (Doc. 109, at 837-38, 844-46).

145. However, Williams was adamant from the time either party bid on the contract, that there would be "[n]o weather days allotted" for the project. (VEC Ex. 7, at 4).

146. Although John Joyce testified that he believed it was possible to request extensions for extreme weather, VEC interpreted Williams's prohibition on "weather days" as a prohibition on requesting extensions for extreme weather. (Doc. 105, at 19; Doc. 108, at 135; Doc. 109, at 837-38, 844-46).

147. VEC did not fail to mitigate damages by failing to request a forty-five-day extension because they had a good faith belief that the extension would not be permitted based on Williams's representations in the bidding stage. (VEC Ex. 7, at 4; Doc. 105, at 19; Doc. 108, at 135).

148. Defendants' assertion that VEC could have mitigated damages by continuing to work with Joyce also fails because VEC did not default Joyce until after Joyce left the project. (Def. Ex. 154; Def. Ex. 192; Doc. 88, at 22-23).

149. Barber's second corrective letter stated that warned Joyce of potential default and requested corrective action. (Def. Ex. 154). This shows VEC did attempt to continue to work with Joyce before Joyce left the project. (Def. Ex. 154).

150. Thus, Defendants fail to meet their burden of proof because they fail to show what reasonable actions VEC should have taken to mitigate damages. *See Prusky*, 532 F.3d at 258–59; *see also Polit*, 567 F. Supp. 3d at 520.

IX. CONCLUSION

For the foregoing reasons, this Court concludes that Joyce breached the subcontract by abandoning the project on June 21, 2021. Judgment is entered in VEC's favor against Joyce in the amount of $818,551.31[14] on Count I, VEC's breach of contract claim. (Doc. 1, ¶¶ 49-54). VEC is entitled to prejudgment interest at a simple rate of six percent per annum from December 19, 2019, to the date of judgment. VEC is also entitled to post judgment interest at the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date on which judgment is entered, on its judgment against Joyce.

VEC's remaining claims fail, and thus, judgment is entered in favor of Joyce on Counts II and III and in favor of Hudson on Count IV. (Doc. 1, ¶¶ 55-66). Joyce's counterclaim counts fail, and thus, judgment is entered in favor of VEC on Counterclaim Counts I, II, III, IV, and V. (Doc. 15, at 28-36).

An appropriate Order shall follow.

Dated: September 29, 2025                    s/ Karoline Mehalchick
                                             **KAROLINE MEHALCHICK**
                                             **United States District Judge**

---

[14] This amount does not include attorneys' fees. Attorneys' fees will be determined in a sperate order after the parties file post-judgment submissions.